John TYLER, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–331.

District of Columbia Court of Appeals.

Argued Sept. 11, 2008.

Decided July 16, 2009.

---

Joanne M. Vasco, Hyattsville, MD, appointed by the court, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., George P. Eliopolous, and Ann H. Petalas, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and REID, Associate Judges, and FARRELL,* Senior Judge.

REID, Associate Judge:

A jury found appellant, John Tyler,[1] guilty of first-degree murder while armed (Stephen Turner),[2] assault with intent to kill while armed (Teanne Miller),[3] carrying a pistol without a license,[4] and possession of a firearm during the commission of a crime of violence.[5] Appellant contends that the trial court (1) violated his Sixth Amendment right to confront witnesses by admitting a 911 recording that contained testimonial hearsay; (2) erred by giving the jury a first aggressor instruction; and (3) violated his due process right to a fair trial by failing to grant his motion for a new trial based on the government's withholding of *Brady*[6] evidence. Discerning no reversible error, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

The government presented evidence[7] showing that the murder of Stephen Turner and assault of Teanne Miller, on January 18, 2003, stemmed from a fist fight between Mr. Miller and appellant Tyler over drugs. The fight had occurred approximately two days earlier. After the fight, Mr. Tyler stated to a friend, Justin Femi, that if Mr. Miller or his companion "come stepping to him ... he will do them ... before they do him."

The critical events leading to the murder and assault took place late on January 18, 2003, and continued through the early morning of January 19, 2003. On the night of January 18, Mr. Miller told his friends, Mr. Turner and Ricardo Jackson, about his previous altercation with Mr. Tyler. The group decided to drive Mr. Miller's Ford Probe from Bladensburg, Maryland, to Dupont Circle, in the Northwest quadrant of the District of Columbia, so that Mr. Miller could fight Mr. Tyler.[8] Shortly after approaching the Dupont Circle area, the three men encountered Mr. Tyler's girlfriend, Candice Pollard, and her friend, Linda Jones, sitting in a white car. Mr. Jackson remained in the Ford Probe while Mr. Miller and Mr. Turner exited and walked towards the white car. Mr. Turner approached Ms. Jones on the driver side and Mr. Miller went to Ms. Pollard on the passenger side of the car. Mr. Turner said, "we want [Ms. Pollard to get] out your car." Ms. Jones stepped out of the car and asked "for what?" Mr. Turner stated "she knows what is going on." Meanwhile, Mr. Miller knocked on the passenger side window. Ms. Pollard was talk-

---

* Judge Farrell was an Associate Judge, Retired, at the time of the argument. His status changed to Senior Judge on January 23, 2009.

1. Mr. Tyler is sometimes referred to as "Twin" in the record, and is also known as Uduak Inyangette. His cell phone records were in the name of Ekere Inyangette.

2. D.C.Code § 22–2101 (2001). Mr. Turner is also referred to as the "tall guy" in the record.

3. D.C.Code § 22–401. Mr. Miller is also referred to as the "short guy" in the record.

4. D.C.Code § 22–4504(a).

5. D.C.Code § 22–4504(b).

6. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. A number of government witnesses testified, including eyewitnesses.

8. On their way to Dupont Circle, the three men stopped at a 7–11 on Eastern Avenue, and met Mr. Turner's brother and two other men who were to follow them to Dupont Circle in a separate car. However, Mr. Miller and his companions lost sight of the other car.

ing on Ms. Jones's cell phone. She did not respond to Mr. Miller.

Ms. Jones told Mr. Turner that she "didn't want to have anything to do with it" and requested that Mr. Turner and Mr. Miller wait until Ms. Pollard got out of her car to speak with her. Mr. Turner agreed, and the two men returned to the Ford Probe. Subsequently, Ms. Jones and Ms. Pollard drove off and at some point saw Mr. Femi (Mr. Tyler's friend) walking on Connecticut Avenue. At Ms. Pollard's request, Mr. Femi got into the white car to assist in finding Mr. Tyler. The Ford Probe followed Ms. Jones's car. Moments later, Ms. Pollard alerted Ms. Jones to the Ford Probe. To evade the Ford Probe, Ms. Jones made a right turn onto a one-way street and ran into traffic at the corner of 20th and N Streets. Almost simultaneously, Ms. Pollard ended the phone call she had been making on Ms. Jones's cell phone.[9] Mr. Tyler appeared at the intersection; Ms. Pollard and Mr. Femi stepped out of the car to speak with him.

Meanwhile, Mr. Turner parked the Ford Probe at 20th and N Streets. Mr. Miller saw Mr. Tyler and said "[t]here he go right there." Mr. Miller exited the passenger side of the car and walked towards Mr. Tyler. Mr. Turner exited the driver side and walked in front of the car while Mr. Jackson exited the back seat of the car on the driver's side. Mr. Tyler took a few steps back, pulled a gun out of his pocket, and shot Mr. Miller twice. Mr. Miller fell to the ground.

Upon seeing a tall and short man approach, Mr. Femi started "stepping back." He heard shots, and saw Mr. Tyler fire the gun; the short man fell. Because he did not "want to get killed," Mr. Femi ran towards Dupont Circle. Mr. Turner and Mr. Jackson ran towards the rear of the Ford Probe. Mr. Turner stopped at the driver side door of the vehicle and at-

9. The cell phone number used by Mr. Tyler at the time was that in the name of Ekere Inyangette, identified by the government as Mr. Tyler's brother. The parties stipulated that Mr. Tyler used that cell phone "during the relevant time period, including January 18, 2003 and January 19, 2003." Records for that phone indicate that Mr. Tyler communicated with a phone belonging to Ms. Jones several times on the night of January 18 and early on January 19. During her appearance as a witness for the defense, Ms. Pollard acknowledged on cross-examination that she used Ms. Jones's cell phone the night of the incident and that she had called Mr. Tyler. She claimed that her use of the cell phone was "not at the time of the incident" but "right after the incident."

Government witness, Crystalee Danko, a Sprint records custodian, explained how Sprint keeps records of cell phone calls and how one can determine approximately where a person is by the location of a cell phone tower. The cell phone signal is captured off of a cell tower, or antenna, located on a building or other structure, and the address of the building or structure indicates the location of the person. Cyrus Raiszapeh, a radio frequency engineer, provided testimony about cell towers, including their operation and location. Cell phone towers are located at specified geographical locations. For example, Tower 87 is located at 77 P Street, in the Northeast quadrant of the District.

The government introduced Exhibit 96, depicting contact between the cell phone used by Mr. Tyler and that of Ms. Jones. The exhibit focuses on calls made between 12:07 a.m. and 12:23 a.m. on January 19. The first call on the exhibit was made at approximately 12:07 a.m. from Ms. Jones's cell phone to that used by Mr. Tyler, and its signal bounced off of Tower 87 in the Northeast quadrant of the District. The last call on the exhibit from Ms. Jones's phone to Mr. Tyler's took place around 12:23 a.m. and lasted seconds longer than 12:30 a.m., the approximate time of the shootings. The signal from the cell phone at the end of that communication was captured by Tower 46 located at 2500 Q Street in the Northwest quadrant of the District. Government Exhibit 96 reveals that during the calls between the first and last, Mr. Tyler was moving from the Northeast quadrant to the Northwest quadrant and the Dupont Circle area.

tempted to get in, but Mr. Tyler walked over to the front of the Ford Probe and fired two shots at Mr. Turner. Mr. Jackson left the scene of the incident. Ms. Jones jumped back into the car with Ms. Pollard and the two also left the scene. Minutes later, Ms. Jones and Ms. Pollard picked up Mr. Tyler, and he instructed Ms. Jones to take him to a specified location. None of the government's witnesses who observed the incident saw a weapon in Mr. Miller's or Mr. Turner's hands.[10]

In addition to those in the Ford Probe or the white car who testified at trial, there were other witnesses at the scene of the shooting. Joseph Cannady, a visitor from North Carolina, identified a photograph depicting the intersection of the shooting as the place where he witnessed a shooting around 12:30 a.m. on January 19, 2003. Jeremy Semple, a native Washingtonian, was in a friend's car traveling on 20th Street toward N in Northwest, when he heard a gun shot. He noticed a white car and an unarmed man "in a retreat mode" who was trying to get into a car. Another man with a gun in his hand fired and hit the retreating man. In the early morning of January 19, 2003, Jeffrey White, a visitor from California, heard gunfire while he was in the lobby of a hotel located near the scene of the crime. He walked to the crime scene, saw two shooting victims, and tried to assist them. One was not responsive. He found no weapons on either victim.

For the defense, Ms. Pollard testified that she and Mr. Tyler had agreed to meet in Dupont Circle the night of the shooting. During her first encounter with Mr. Miller and Mr. Turner that night, Mr. Turner said to her "I should bust your a* *, and ... flashed the top part of a pistol." After Mr. Miller and Mr. Turner left, she called Mr. Tyler, reported the incident, and told him to meet her "on the next street over, because the boys were up here[,] [she] didn't want ... more drama[,]" and "they had guns." Ms. Pollard called Mr. Tyler two more times before he arrived. When Mr. Tyler arrived, Ms. Jones pulled her car over to the side of the street. Ms. Pollard got out of the car to open the back door for Mr. Tyler; Mr. Miller's car pulled up behind them.[11]

According to Ms. Pollard, Mr. Miller got out of the car first, approached Mr. Tyler, and said "What's up?" Mr. Tyler responded, "What's up?" Mr. Turner jumped out of the car and Mr. Tyler backed up, pushed Ms. Pollard, then shot Mr. Miller and Mr. Turner, and ran away from the scene. Ms. Pollard did not see either Mr. Miller or Mr. Turner with a weapon during the encounter. Ms. Pollard and Ms. Jones picked up Mr. Tyler a couple of minutes after the shooting. Mr. Tyler seemed "nervous," was "sweating" and "shaky." Ms. Pollard asked him "why did you do that," and he responded "I didn't know if they was going to kill you. I didn't know if they was going to kill me first." Ms. Pollard's (rather surprising) testimony for the defense provided the evidentiary basis for appellant's claim of self-defense.

---

10. Natasha Pettus, crime scene technician for the Metropolitan Police Department, testified that police only recovered one weapon at the scene of the shooting. They found a knife inside the pocket of Mr. Miller's jacket with the blade covered by a leather case.

11. On cross-examination, the government impeached Ms. Pollard with her 2005 perjury conviction that arose from false testimony given during her grand jury testimony in the instant case, as well as a 2005 conviction for possession of a firearm during the commission of a crime of violence, and 2003 convictions for possession with intent to distribute cocaine and attempted possession with intent to distribute cocaine.

## ANALYSIS

### The Confrontation Clause Claim

Mr. Tyler contends that the trial court violated his constitutional Sixth Amendment Confrontation Clause rights by admitting a 911 recording of an anonymous caller's statements after the shooting occurred in this case. He asserts that the statements made in that recording were testimonial because they provided "[a]n account of past events" and "were made by witnesses, not the victim, who were not themselves in danger, after the assailant had fled and the callers had left the area." The government argues that the trial court properly admitted the 911 recording because "the anonymous call in this case did not possess any of the indicia of formality that are usually attendant to testimonial statements." Rather, the 911 recording had three primary purposes that pertained to an on-going emergency: "(1) to report that a shooting had just occurred; (2) to obtain medical assistance for persons who had been wounded by the gunfire; and (3) to assist the police in identifying an armed assailant who remained at large."

■ The Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."[12] The term "witness" applies to "witnesses against the accused—in other words, those who bear testimony. Testimony in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."[13] The Supreme Court in *Davis v. Washington,*[14] articulated the difference between testimonial and nontestimonial statements.

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions.[15]

Among declarations considered part of the core class of testimonial statements are those "taken by police officers in the course of interrogations . . . ."[16]

■ Although a 911 operator's questions to a caller may constitute police interrogation,[17] statements made in initial response to such questions are generally considered nontestimonial. "A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."[18] However, once that purpose has been achieved, the statements evolve into testimonial statements.[19] "[T]he . . . inquiry under the Sixth Amend-

12. *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

13. *Id.* at 51, 124 S.Ct. 1354 (citation and internal quotation marks omitted).

14. 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

15. *Id.* at 822, 126 S.Ct. 2266.

16. *Crawford, supra* note 12, 541 U.S. at 52–53, 124 S.Ct. 1354.

17. *See Davis, supra* note 14, 547 U.S. at 823 n. 2, 126 S.Ct. 2266.

18. *Id.* at 827, 126 S.Ct. 2266.

19. *Id.* at 828, 126 S.Ct. 2266.

ment is whether the questions asked by the dispatchers and statements made by the complainant [or the non-victim caller] ... were primarily motivated by the urgency of seeking assistance in an ongoing emergency, so that they are not, under *Davis*, testimonial statements subject to the Confrontation Clause." [20] In evaluating a statement to determine whether it is testimonial or nontestimonial, the final analysis must focus on "the declarant's statements, not the interrogator's questions...." [21]

■ The record reveals that during the 911 call at issue here, the first statement made to the operator was "[w]e just saw somebody get shot. I don't know if he's o.k. It was 20th and ... N." The 911 operator responded: "did you see the person who did the shooting?" The caller replied "[i]t was an African American ... [w]earing all black with like a silver gun." The operator then inquired into whether the person was "shooting or ... actually shoot [sic] someone." The caller stated "he shot three times. He fell but then he was running, and we drove away." A third party then intervened. The third party told the operator:

> He shot someone right in front of us. He was—the man was trying to get into his car and he was on the ground. He shot him twice and he was on the ground and he tried to get into the car. The man walked over and he shot him in the car. And he shot him like two or three times and then he got into the car and he shot him again.

The operator sought a description of the assailant. The third party described the assailant as "wearing all black. He was wearing like a hat and stuff and a puffy jacket...." Finally, the operator again inquired about the location of the victims. The third party stated that the victims were in a "white ... hatchback car; the windows were tinted." The operator ended the call by confirming the location of the incident and telling the third party that they would have the police send an ambulance to the scene of the shooting.

The trial court found, and we agree, that the 911 operator's questions were primarily asked, and the corresponding answers given, to determine whether police assistance was needed to meet an ongoing emergency.[22] The 911 call was made right after the caller and the third person on the call saw the shooting. At that point the victims most likely still were on the ground and in need of assistance, and the shooter still was at large with a weapon that could injure others. The exigency continued and the operator's questions focused on whether a shooting actually occurred; the location of the shooting; the appearance of the assailant; and the location of the victims. In response to all these questions, the caller merely "describe[d] current circumstances requiring police assistance." [23] In *Davis*, the 911 operator learned during the 911 call that the assailant who was assaulting the victim had run out of the house and left in a car. Nevertheless, the operator instructed the caller to "[s]top talking and answer my questions," and "proceeded to pose a battery of questions." [24] The Court determined that the operator already had

**20.** *Smith v. United States*, 947 A.2d 1131, 1134 (D.C.2008).

**21.** *Davis, supra* note 14, at 822 n. 1, 126 S.Ct. 2266.

**22.** *Id.* at 828, 126 S.Ct. 2266 ("the circumstances ... objectively indicate [the] primary

purpose [of the 911 call] was to enable police assistance to meet an ongoing emergency").

**23.** *Id.* at 827, 126 S.Ct. 2266.

**24.** *Id.* at 818, 828, 126 S.Ct. 2266.

"gained the information needed to address the exigency of the moment, the emergency appear[ed] to have ended (when Davis drove away from the premises)[,]" and "[i]t could readily be maintained that, from that point on [the caller's statements in response to the operator's subsequent questions] were testimonial...." [25] That is not the situation here where the 911 caller and the third person provided information relating to a continuing emergency—injured and dying victims on the ground and an armed assailant on the loose. Based on this record, we see no reason to disturb the trial court's ruling that the primary purpose of the operator's questioning and the declarants' responses was to enable the operator to send the appropriate police and medical assistance.

### The First Aggressor Jury Instruction

■ Mr. Tyler argues that the trial court's first aggressor jury instruction constituted error. He objected to the instruction, and now maintains that "no evidence suggests that [he] 'voluntarily placed [himself] in a position which [he] could [have] reasonably expecte[d] would result in violence.'" [26] Rather, the victims took aggressive action against him "[c]ommencing with the plan to hunt for and find [him] to fight with him, [and continuing with] the possession and displaying of a weapon, ... accosting Jones and Pollard in their auto-

mobile while making threatening remarks against [him] ..., following Jones's vehicle in order to locate [him], [and] jumping from their car and approaching him...." The government contends that the trial court properly gave the first aggressor instruction (at the government's request) because the evidence supported an inference that Mr. Tyler came to the scene armed and, inferentially, looking for a fight. Moreover, the government asserts that although the "victims intended to engage in a fist fight ... their conduct did not entitle [Mr. Tyler] to use deadly force in self-defense, especially when [Mr. Tyler] had the ability to avoid the confrontation altogether by staying at home or by fleeing from 20th and N ... once he encountered the victims."

We begin with the factual and procedural context for Mr. Tyler's claim. The first aggressor issue surfaced when the trial court inquired why it should give a self-defense instruction and commented that "there is sort of conflicting testimony." Eventually, from the parties' conflicting characterizations of the evidence,[27] the court concluded that a self-defense instruction was supported by some of the evidence in the case, but that the jury should also decide whether appellant had forfeited the defense in the manner the first aggressor instruction [28] explains. The trial judge

25. *Id.* at 828–29, 126 S.Ct. 2266.

26. *Sams v. United States,* 721 A.2d 945, 953 (D.C.1998).

27. According to the government, Mr. Tyler "came to the area ... armed with a pistol, ... after being contacted by Ms. Pollard about these victims." The government argued that although there is evidence that Mr. Miller went to the Dupont Circle area to fight Mr. Tyler, there is also evidence that Mr. Miller "got out of the car and was walking with no weapon, ... when [Mr. Tyler] shot him, meaning that shot was the first aggressor." The defense objected and pointed to testimony indicating that Mr. Turner or Mr.

Miller was armed. Defense counsel maintained that under the circumstances of this case, *Rorie* precluded the first aggressor instruction. Defense counsel also filed a "Memorandum of Law of Instruction 5.16" asking the trial court to reconsider its decision to give the first aggressor instruction, essentially because of the defense view that "the evidence presented at trial has revealed that the decedent and the complaining witness, not Mr. Tyler, were the first aggressors."

28. Criminal Jury Instructions for the District of Columbia (4th ed.), Instruction No. 5.16 provides in pertinent part:

A. *Where Defendant or Complainant Might Have Been Aggressor*

explained her reasons for giving the first aggressor instruction:

> The testimony that the Court must consider when determining whether or not to give these instructions on first aggressor is not just the Defense testimony but it's the Government testimony as well.
>
> And the testimony, if you believe [defense witness] Candice Pollard ... she never even thought the two men were following them. So she couldn't have told Mr. [Tyler] ... that the boys were up there and to meet her somewhere else. Well, she didn't tell him, according to her, that they were following her. But if you credit the testimony of ... [government witness] Linda Jones ... that Ms. Pollard ... told [her] that the boys were following them.
>
> And ... the testimony that she was on the phone with Mr. Tyler ... three, probably four times, during this short period of time ... that they were being followed, ... she could have told them [sic] that.
>
> ... And then there's the testimony of the Government's witnesses ... that the other people didn't do anything, that they just got out of the car.... If there's testimony in the record from which the jurors could believe that the other people just got out of the car and then they got shot by Mr. Tyler that in my view, warrants a first aggressor instruction and I don't think Rory [sic] precludes that at all.

In addition to instruction no. 5.16, the trial court gave instructions relating to self-defense.[29]

▮▮▮▮▮ "When the trial court gives a jury instruction that the defense has challenged, we review the instructions for abuse of discretion." [30] "A trial court has broad discretion in fashioning appropriate jury instructions...." [31] The court's decision to grant or deny an instruction request should " 'be based upon and drawn from a firm factual foundation.' " [32]

▮▮▮▮▮ Our case law teaches that for a defendant to invoke self-defense, the record must reflect that:

> (1) there was an actual or apparent threat [to the defendant]; (2) the threat was unlawful and immediate; (3) the defendant honestly and reasonably believed that he was in imminent danger of death or serious bodily harm; and (4) the defendant's response was necessary to save himself from danger.[33]

---

[There has been testimony both that the complainant was the aggressor and that the defendant was the aggressor. You must first determine from the evidence whether, in fact, the defendant was the aggressor.] B. *Mere Words Not Provocation* If you find that the defendant was the aggressor, or if s/he provoked the conflict upon himself/herself, s/he cannot rely upon the right of self-defense to justify his/her use of force. One who deliberately puts himself/herself in a position where s/he has the reason to believe that his/her presence will provoke trouble cannot claim self-defense. Mere words without more by the defendant, however, do not constitute aggression or provocation.

**29.** The trial court read instruction no. 5.12, "Self–Defense—General Consideration" and 5.13, "Self–Defense—Amount of Force Permissible."

**30.** *Broadie v. United States,* 925 A.2d 605, 621 (D.C.2007) (citation omitted).

**31.** *Psychiatric Inst. of Wash. v. Allen,* 509 A.2d 619, 625 (D.C.1986) (citations omitted).

**32.** *Nelson v. McCreary,* 694 A.2d 897, 901 (D.C.1997) (quoting *Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979)).

**33.** *Rorie v. United States,* 882 A.2d 763, 771 (D.C.2005) (quoting *Hernandez v. United States,* 853 A.2d 202, 205 (D.C.2004)).

In short, "[i]f one has reason to believe that he will be attacked, in a manner which threatens him with bodily injury, he must avoid the attack if it is possible to do so...."[34] Hence, "a defendant cannot claim self-defense if the defendant was the aggressor, or if s/he provoked the conflict upon himself/herself."[35] Here, of course, the trial judge did not withhold the issue of self-defense from the jury, but instead allowed the jury to consider, as part of it, whether appellant had forfeited the doctrine's protections because he was the first aggressor.

Appellant's reliance on *Rorie* is misplaced because the evidence of first aggression by the defendant presented in *Rorie* was very different from the evidence here. *Rorie* involved a first aggressor jury instruction issue where defendant was convicted of the lesser-included offense of voluntary manslaughter while armed. The victim and defendant in *Rorie* had three encounters or altercations, separated by time and a period of disengagement. In the first encounter, defendant choked a female and the victim began to swing a baseball bat at him. Around two and one-half hours later and during the second encounter, the female complained that defendant "was messing with her again" and the victim and defendant exchanged words inside and outside of the residence. The final episode occurred around one to one and one-half hours after the second encounter. The victim instructed defendant to leave the premises and cursed defendant. While defendant was gathering his possessions, the victim approached him and began choking defendant. Defendant was about to lose consciousness and felt as though he was beginning to die; he reached for his knife and "struck" or stabbed the victim once but the victim continued to choke him and defendant "struck" or stabbed him again.[36] We concluded that the trial court committed reversible error in giving the first aggressor instruction; that the defendant's "aggression toward a third party [the female] did not turn [him] into an aggressor against or provocateur toward [the victim]"; that the court should have focused on the final encounter in determining whether to give the first aggressor instruction; and that "there was no factual predicate for th[e] charge" because "there was no basis on which the trial court reasonably could infer that [defendant] was the aggressor toward or provoked [the victim] during the final episode...."[37] "[I]nstruction no. 5.16(B) is appropriately given when there is both evidence of self-defense and evidence that the defendant provoked the aggression from which he was defending himself."[38]

Unlike *Rorie*, the trial court's decision to give the first aggressor instruction in this case was consistent with the fundamental legal principles pertaining to "the first aggressor" or provocation. There was some evidence, if believed by reasonable jurors, that Mr. Tyler engaged in self-defense because Mr. Miller and Mr. Turner approached him and he took steps backward before shooting. However, as we set forth at length in note 9, *supra*, there also was some evidence, again if believed by reasonable jurors, supporting a reasonable inference that Mr. Tyler "provoked the aggression from which he was defending himself" by traveling from Northeast Washington to the Northwest Dupont Circle area to

---

34. *Laney v. United States*, 54 App. D.C. 56, 58, 294 F. 412, 414 (1923).

35. *Rorie, supra* note 33, 882 A.2d at 772 (citation and internal quotation marks omitted).

36. *Id.* at 764, 773–74.

37. *Id.* at 775, 777.

38. *Id.* at 775 (citations omitted).

confront Mr. Miller and Mr. Turner while he was in frequent cell phone contact with Ms. Pollard. As is clear from the record, some of the government and defense testimony not only differed but was in conflict. In *State v. Wingate*,[39] as here, the defense version of key events differed from the government's version, especially as to whether or not the victim had a weapon and as to the circumstances under which the defendant shot the victim. The State requested a first aggressor instruction, the defense objected, and the trial court gave the instruction.[40] The Supreme Court of Washington declared that "the trial court properly gave the first aggressor instruction in light of the conflicting evidence regarding who precipitated the confrontation between [the defendant], [the victim] and [the victim's] companions."[41] Similar to *Wingate*, and based on the evidentiary record in this case and the conflicting testimony from government and defense witnesses, we cannot say that the trial court abused its discretion in granting the government's request to give the jury a first aggressor instruction.[42]

### The Brady Issue

 Finally, Mr. Tyler argues that the trial court erred by not granting him a new trial after the government revealed previously undisclosed evidence that Ms. Pollard (who did not testify for the government but was called by the defense)[43] was an admitted "pathological liar." He maintains that the government's withholding of that information prejudiced him by preventing him from making an informed decision on whether to call Ms. Pollard as his only witness. He argues that had he known this information earlier, the defense theory would have been different; he would neither have called Ms. Pollard as a witness nor conceded that he was on the scene of the incident. He further asserts that "[t]he withholding of this information regarding [Ms.] Pollard must be viewed within the context of the totality of the government's obstructionist tactics," such as the failure "to inform the defense in advance that a government witness had entered the crime scene and moved the victims prior to the arrival of the police." Those tactics, he maintains, "deprived [him] of a fair trial."[44]

The defense called Ms. Pollard as its only witness. On cross-examination, the prosecutor asked Ms. Pollard whether she had previously told law enforcement offi-

---

**39.** 155 Wash.2d 817, 122 P.3d 908, 911 (2005).

**40.** *Id.* at 910.

**41.** *Id.* at 911. In our decision in *Muschette v. United States*, 936 A.2d 791 (D.C.2007), we mentioned no conflicting evidence in rejecting appellant's argument that "the trial court erred in instructing the jury that a defendant may not claim self-defense where he was the first aggressor or where he deliberately placed himself in a position where he reasonably believed his presence would provoke trouble." *Id.* at 799 n. 9. We said "that instruction was supported by ample evidence in the record...." *Id.*

**42.** *See Johnson v. United States*, 398 A.2d 354, 361–67 (D.C.1979).

**43.** Mr. Tyler claims he was "[l]ed into believing the government would call [Ms.] Pollard, a witness that the defense believed to be very damaging to [Mr.] Tyler...."

**44.** Mr. Tyler did not raise this argument in his motion for a new trial, nor at any other time during trial. Thus, we review for plain error. *See Little v. United States*, 665 A.2d 977, 980 (D.C.1995) (citing *Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)). Even if Mr. Tyler could show that the trial court committed error and that error was plain, he could not establish that the government's actions caused a miscarriage of justice. *See Thomas v. United States*, 914 A.2d 1, 8 (D.C.2006).

cers that they could not believe a word that she said because she was a "pathological liar." Ms. Pollard replied, "No." Detective Scott Gutherie, a rebuttal witness for the government, confirmed that Ms. Pollard had made the statement about being a pathological liar and she had advised him that the police "could even check with her family members, including her mother, and a doctor [who] was treating her at the current time, [to] ... substantiate her statement."

On August 8, 2005, the defense filed a motion for a mistrial, asking the trial court to dismiss the case with prejudice for a *Brady* violation due to the government's failure to advise them of Ms. Pollard's admission that she was a pathological liar. The trial court rejected the *Brady* contention and denied the mistrial motion.[45]

 Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[46] The government must disclose both exculpatory information and "evidence ... that affects the credibility of a government witness where material to

guilt or punishment."[47] "Favorable evidence is 'material' within the meaning of the *Brady* doctrine ... only 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"[48] That is to say, that the "mere possibility that the undisclosed evidence *might* have aided the defense or changed the trial's outcome does not make the evidence material to guilt or punishment."[49] Mr. Tyler, therefore, must satisfy the following three components of a *Brady* violation to succeed on his claim: that "the evidence ... must be favorable to the accused," the government failed to disclose the evidence, and he was prejudiced by the suppression of the evidence.[50]

Here, we see no reason to disagree with the trial court's decision to deny Mr. Tyler's motion for a new trial. Ms. Pollard's statement that she was a "pathological liar" was not material to his guilt. The government did not call Ms. Pollard as its own witness, so Mr. Tyler could not have used the statement to cast doubt on the veracity of a key government witness. Therefore, as Mr. Tyler readily admits, he could have only used the statement in deciding whether to call Ms. Pollard as a

---

45. In denying the mistrial motion the trial court stated, in part:

> I just don't know what obligation the Government had to apprise the [d]efense that a witness that apparently the Government wasn't going to call had said she was a pathological liar.... [I]f the Government had planned to call her as a witness ... and they had this information that she had said she was a pathological liar and suggested that there was a doctor or some professionals who had information about that then that might have given rise to some obligations under *Brady* but the way this has happened I just don't find a basis for finding [a] *Brady* violation.

46. *Brady, supra* note 6, 373 U.S. at 87, 83 S.Ct. 1194.

47. *Beatty v. United States*, 956 A.2d 52, 56 (D.C.2008) (quoting *Sykes v. United States*, 897 A.2d 769, 777 (D.C.2006)) (other citations and internal quotation marks omitted).

48. *Rowland v. United States*, 840 A.2d 664, 687 (D.C.2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (other citation)).

49. *Stewart v. United States*, 881 A.2d 1100, 1116–17 (D.C.2005) (emphasis in original) (citation and internal quotation marks omitted)

50. *See Strickler, supra* note 47, 527 U.S. at 281, 119 S.Ct. 1936.

witness. Before calling Ms. Pollard, the defense had substantial knowledge about her. Ms. Pollard was Mr. Tyler's girlfriend, and the defense knew she had been found guilty of perjury with respect to events in this case. Even if Mr. Tyler had decided not to call Ms. Pollard and had changed his defense theory to argue that he was not present at the scene of the shooting, the government presented strong and compelling evidence of his guilt. Mr. Jackson, Mr. Femi, and Ms. Jones (all of whom knew Mr. Tyler) testified that they saw Mr. Tyler at the scene of the shooting, and Mr. Jackson said he witnessed Mr. Tyler shoot both Mr. Miller and Mr. Turner. Government witness, Mr. Semple, who happened to be in the crime scene area, saw the shooting. The testimony of these witnesses was corroborated by Mr. Tyler's cell phone records from which reasonable jurors could conclude that Mr. Tyler traveled from Northeast Washington to the Northwest area where the shooting occurred, arriving there around the time Mr. Turner and Mr. Miller were shot.

We conclude that Mr. Tyler failed to demonstrate that the information that Ms. Pollard allegedly was "a pathological liar" satisfied the *Brady* materiality requirement. In short, based upon our review of this record, we discern no reasonable probability that Ms. Pollard's undisclosed statement that she was a pathological liar would have produced a different verdict.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*