*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-1719

JOSEPH JONES, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-21632-10)

(Hon. Ann O'Regan Keary, Motions Judge)
(Hon. Robert I. Richter, Motions and Trial Judge)

(Submitted April 3, 2014                    Decided September 18, 2014)

*Richard S. Stolker* for appellant.

*Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Tejpal Chawla*, and *Margaret Barr*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and REID, *Senior Judge*.

THOMPSON, *Associate Judge*:  A jury convicted appellant Joseph Jones of conspiracy to commit robbery, two counts of armed robbery, and obstruction of justice.  He appeals his convictions, arguing that (1) the trial court erred when it admitted testimony relaying the statements of an alleged co-conspirator without

first determining the existence of a conspiracy in which appellant was a participant; (2) the government's failure to disclose to appellant before trial the transcript of the grand jury testimony of one of the victims violated appellant's due process rights; (3) the trial court erred in not suppressing the identification of appellant by one of the complainants; (4) appellant was deprived of an opportunity to prepare adequately for trial when his trial counsel's representatives were prevented from attending the plea proceeding of the alleged co-conspirator; and (5) the evidence did not support a conviction for obstruction of justice as charged in the superseding indictment. For the reasons explained below, we reject appellant's arguments and affirm all of his convictions.

## I.

The government presented evidence at trial showing that on October 22, 2010, Tierra Fenwick and Chauncey Terrell were victims of an armed robbery committed by two assailants. Fenwick, who was carrying a large sum of cash, and Terrell traveled to the Mayfair/Paradise neighborhood, where they planned to purchase marijuana and phencyclidine ("PCP"). Fenwick asked a man in the neighborhood where she could make the purchases, and he advised her to go see Gary Nichols and a man known as "Tip" or "Tipper." After finding the two men,

Fenwick and Terrell purchased marijuana from Tipper. According to Terrell's testimony, when Fenwick was making her purchase, she took out a large wad of cash. When Fenwick asked Nichols about purchasing PCP, he told Fenwick to meet him at an apartment in a nearby building.

Fenwick and Terrell entered the indicated apartment building and knocked on the door of the designated unit, but no one answered the door. Fenwick then called Nichols on his cell phone, and he said he was on his way to the apartment. From inside the building, Fenwick saw two men "with T-shirts tied around their face[s], like ninjas" outside, approaching the front entrance. Before Fenwick and Terrell could leave the building, the two men entered through the back door and "rushed" Fenwick and Terrell. Fenwick testified that, upon seeing his eyes and hearing his voice as he addressed her by her nickname, she recognized one of the men as appellant, whom she had known for four to six years and knew as "J-Mo."[1] As appellant, who was holding a gun, took Fenwick's money, he threatened to kill her if she snitched.

---

[1] While Terrell did not know appellant, he also heard the exchange between Fenwick and her assailant.

James Lindsey, who lived in the Mayfair neighborhood, testified that on the day of the robbery he saw and heard Nichols and appellant outside speaking to each other. Nichols then "left for a moment," walked toward his house, came back and passed to appellant an object (which the government alleged was a gun).

After the robbery, Fenwick called the police. After Fenwick recounted to them what had happened, officers showed Fenwick a photo array that did not include a picture of appellant, and Fenwick did not make an identification. Several days later, appellant called Fenwick's house telephone and stated that he had heard that the "police was looking for him and if he found out it wasn't going to be pretty." On November 11, Metropolitan Police Department detectives showed Fenwick another photo array, and in "less than a minute" Fenwick pointed to a photograph of appellant and stated, "That's J-Mo right there."

The government introduced evidence about the time of Fenwick's 911 call (6:40 p.m.) and evidence of appellant's phone records before and after the time of the robbery. At 5:09 p.m., appellant received a text message from an unknown person saying, "I need to get . . . $250 real quick, or I'm going to be locked up." **[7/26: 630]** Appellant responded, "We got to make something happen ASAP[,]" and "I'm going to try to make it to you as soon as I can." Four short phone calls

between Nichols and appellant occurred between 6:25 p.m. and 6:30 p.m. and between 6:41 p.m. and 6:45 p.m.

April Gatewood testified that on the day of the robbery, when she met with appellant sometime after 6:49 p.m., appellant told her that he had just "done something to get some money," and, upon seeing police officers on the street, stated, "they might be looking for me."

## II.

Appellant contends that the trial court erred when it "refus[ed] to conduct a pretrial hearing as to [whether the government had proved by a preponderance of the evidence] the existence of a conspiracy" before allowing the government "to offer a statement of a purported co-conspirator in evidence."[2] We disagree.

"[A] coconspirator's out-of-court assertions may be admitted as nonhearsay evidence [against a defendant]. . . only if the prosecution proves that (1) a

---

[2]  In declining to hold the pre-trial hearing, the court ruled that while the government would be required to establish evidence of a conspiracy before the court would admit co-conspirator hearsay statements, it was not necessary for the government to make the requisite showing before trial.

conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the coconspirator made the statements during the course of and in furtherance of the conspiracy." *Butler v. United States*, 481 A.2d 431, 439 (D.C. 1984). "[T]he judge should determine the ultimate admissibility of co-conspirators' statements," *id.*, while considering only "independent nonhearsay evidence," *Jenkins v. United States*, 80 A.3d 978, 990–91 (D.C. 2013) (holding that, despite *Bourjaily v. United States*, 483 U.S. 171 (1987), "*Butler*'s 'state law' holding" "remains controlling authority in [this jurisdiction]"). However, the determination prescribed by *Butler* is necessary only if the statement at issue is otherwise inadmissible hearsay. *See Walker v. United States*, 982 A.2d 723, 737 (D.C. 2009) (co-conspirator's testimony that other participants in a burglary asked him whether he would "go on the move [i.e., the robbery]" and told him "to look in the basement" for the money was not hearsay testimony because the statements were a question and an instruction, not an assertion of fact) (internal quotation marks omitted). "Hearsay is an assertion of fact or belief made out of court and offered to prove the truth of the matter asserted." *Mercer v. United States*, 864 A.2d 110, 117 (D.C. 2004).

Here, the putative "hearsay" statements, which appellant argues were admitted without a finding about the existence of the charged conspiracy, came in through Lindsey's testimony: "I just heard [alleged co-conspirator] Mr. Nichols

telling Mr. Jones that a young lady wanted to buy some PCP. She had — at least a thousand, or $1,500 worth. And he said we need to get that up off her." We agree with the government that these statements either were not hearsay[3] or fell within an exception to the hearsay rule. The statements about the "young lady" and the large amount of cash she had available to buy drugs were not offered for the truth of the matters asserted, but, as reflected in the prosecutor's closing argument, instead were offered to prove that appellant was led to believe that Fenwick was carrying a large amount of cash (whether or not she truly was) and to show the effect of the information on appellant (i.e., that he conspired with Nichols to steal Fenwick's money).[4] *Cf. In re Dixon*, 853 A.2d 708, 712 (D.C. 2004) ("[T]his court has routinely recognized out-of-court statements as non-hearsay when they are used to

---

[3] The same conclusion applies to two other items of testimony that appellant highlights: (1) "testimony [that] phone calls [occurred] between Nichols and appellant" (without mention of the substance of those calls) and (2) Fenwick's testimony that "Nichols told her to go to the apartment building to purchase drugs." *Cf. Walker*, 982 A.2d at 737 (testimony about "directions given" by one of the co-conspirators could be admitted without *Butler*-type findings); *Butler*, 481 A.2d at 438 n.10 ("a directive offered to prove that instruction was given" was "not hearsay").

[4] The prosecutor argued, "And how do we know that [Nichols] saw her? Because Mr. Lindsey told you he'd heard [Nichols] and [appellant] talking about the money that Ms. Fenwick had and saying that they needed to get it up off her, conspiring to commit this robbery."

show the effect on the listener and not to prove their truth.").[5] The statement "we need to get that up off her" was admissible as a non-hearsay statement in that it was a "verbal act[] that manifest[ed] the conspiratorial agreement." *Jenkins*, 80 A.3d at 993 ("Statements between alleged coconspirators can be relevant wholly apart from their truth or falsity because the very act of plotting is itself compelling proof of the existence of the conspiracy."); *see also State v. Henry*, 752 A.2d 40, 46 (Conn. 2000) (statement by a coconspirator to the defendant that they would shoot the victim upon sight was not hearsay because it was "evidence of [an] agreement to shoot [the victim]" and thus had "probative value without respect to its truth").[6]   In addition, since it conveyed the speaker's state-of-mind, the

---

[5] Even if the statements that Fenwick sought to buy PCP and that she was carrying a large amount of money had been offered or were considered by the jury for their truth, there was ample other evidence of these facts (i.e., Fenwick's own testimony and Terrell's testimony to the same effect).  Moreover, in his closing argument, appellant emphasized the fact that Fenwick "went to the area to buy drugs" and went to the building because "she wanted to buy some PCP."  Thus, even if we assume *arguendo* that the trial court erred in some way in admitting this testimony, we cannot conclude that appellant was prejudiced by the error.

[6] We also note that while appellant complains of the trial court's ruling declining to hold a pre-trial hearing on the admissibility of co-conspirator hearsay statements, this court has specifically instructed that the trial court "should make the admissibility determination *during the prosecution's evidence*[,]" to "avoid[] the impracticality of [a] mini-trial[.]" *Butler*, 481 A.2d at 441 (italics added).

statement "we need to get that up off her" also was admissible under the state-of-mind exception to the hearsay rule.[7]

## III.

Prior to trial, the government sent appellant a letter disclosing the substance of certain portions of Terrell's grand jury testimony, including in relevant part: (1) that Terrell described "Tip," from whom Fenwick and Terrell purchased marijuana, as "approximately 5'6", light skinned, wearing an all black coat with a ski mask folded up on top of his head; (2) that Terrell described Nichols as "dark skinned, 5'6" or 5'7", with a tattoo under his right eye"; (3) that Terrell testified that one of the robbers had "'like a ski mask on' and the other had 'like a shirt tied around his face.'" Thereafter, appellant filed a motion to compel the government

---

[7] *See Clark v. United States*, 412 A.2d 21, 26 (D.C. 1980) (explaining that exception to the hearsay rule, which applies to statements that "convey[] the intent of the declarant to perform an act in the future, where there is an issue as to whether in fact the act later was performed."); *Laumer v. United States*, 409 A.2d 190, 201 n.14 (D.C. 1979) (en banc) (explaining that a declarant's "incriminating statement of future intent to commit [a] crime for which an accused is charged" is covered by the state-of-mind exception).

to disclose immediately the actual transcripts of Terrell's grand jury testimony. The trial court denied appellant's motion.[8]

Appellant argues on appeal that "[t]he description given by Terrell of 'Tip,' . . . was quite similar in appearance to the description of one of the robbers in the hallway," and therefore the government had "an obligation . . ., even without a defense request, for turnover of the transcript of Terrell's grand jury testimony." He contends that the government's failure to timely disclose that information (which he suggests was relevant to a third-party perpetrator defense) violated *Brady v. Maryland*, 373 U.S. 83 (1963),[9] and prejudiced his defense.

To succeed on a *Brady* claim, an appellant must show that the government failed to disclose favorable or impeaching evidence and that he "was prejudiced by the suppression of the evidence." *Tyler*, 975 A.2d at 860. Appellant's *Brady*

---

[8] Generally, "the pretrial release of a grand jury transcript" is mandated only when "the party seeking disclosure has established a particularized need that outweighs the time-worn considerations." *Davis v. United States*, 641 A.2d 484, 490 (D.C. 1994) (internal quotation marks omitted).

[9] "Under *Brady*, the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Tyler v. United States*, 975 A.2d 848, 860 (D.C. 2009) (internal quotation marks omitted).

claim fails because he has not identified any favorable or impeaching information contained in the transcript of Terrell's grand jury testimony that was not disclosed in the government's pre-trial disclosure letter. Likewise, appellant fails to explain how he was prejudiced by the delayed disclosure of the transcript (which was provided by the government as Jencks Act[10] material before Terrell testified at trial). Since appellant has neither identified what exculpatory or impeaching evidence was "known to the government but unknown to him" from the testimony summary the government provided pre-trial, *see United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir. 1973), nor shown any "reasonable probability" that earlier disclosure of the transcript "would have produced a different verdict," *see Rowland v. United States*, 840 A.2d 664, 687 (D.C. 2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)), we can find no *Brady* violation here.

## IV.

Appellant filed a pre-trial motion "to suppress[] identification testimony" regarding Fenwick's photo-array identification of appellant. He argued that two of the photographs in the array, including his, "st[oo]d out from the others." The trial

---

[10] 18 U.S.C. § 3500.

court (Judge Richter) found the photo array to be "one of the least suggestive arrays [the court had] ever seen," and denied the motion to suppress.

In this appeal, appellant no longer argues that the photo array was suggestive. Instead, he emphasizes that Fenwick recognized appellant because of his eyes and "tattoos on his neck," but then conceded at trial that there were no tattoos on appellant's neck.[11] Appellant argues that these inconsistencies "rendered [Fenwick's] identification of appellant too unreliable to present to the jury."[12]

---

[11] Appellant also highlights that after the robbery, Fenwick said during the 911 telephone call that "the individuals who had robbed her . . . were wearing ski masks," but then at trial "changed her testimony and said that the robbers were not wearing ski masks, but had black T-shirts wrapped around their faces 'like ninjas.'" This inconsistency, however, is unrelated to Fenwick's identification of appellant; she did not identify appellant as her assailant based on the ski mask or shirt wrapped around his face. In any event, appellant cross-examined Fenwick about this apparent inconsistency, and it was for the jury to consider whether this inconsistency rendered Fenwick incredible. *See Graham v. United States*, 12 A.3d 1159, 1164 (D.C. 2011) ("Credibility is normally for the jury to determine.")

Appellant points to another "inconsistency" — that Fenwick "claimed to recognize [appellant's] voice on the telephone after the robbery, [but] at trial she admitted that she had recognized [appellant's] voice only when hearing him at the trial." Appellant misstates Fenwick's testimony. She testified that the trial was the first occasion on which she *stated* that she recognized appellant by his voice, not that it was the first time she recognized his voice.

[12] At times, appellant's brief seems to conflate the admission of the photo-identification evidence, to which he objected at trial, and the admission of

(continued…)

Without a claim that the photo array was unduly suggestive, appellant's argument is unavailing. If an identification procedure was impermissibly suggestive, the issue becomes whether "under all the circumstances, the identification was reliable nonetheless." *United States v. Brown*, 700 A.2d 760, 761 (D.C. 1997). However, barring a finding of undue suggestivity, "it is the function of the jury to determine whether eyewitness identification is reliable." *United States v. Hunter*, 692 A.2d 1370, 1374 (D.C. 1997). Here, we defer to the trial court's unequivocal finding, uncontroverted on appeal, that the identification procedure was not suggestive, and we may not second-guess the jury's (implicit) determination about reliability. *See Brown*, 700 A.2d at 762 (disapproving of the trial court's approach of "failing to find undue suggestivity but suppressing [the identification], nonetheless, for unreliability").

We also reject appellant's suggestions that inconsistencies in Fenwick's identification of her assailant rendered the government's evidence insufficient for

_____

(…continued)
Fenwick's in-court identification of him, to which he did not object. We focus on the former; as to the latter, we note that a trial judge does not err in admitting evidence of an in-court identification "in the absence of a timely objection to its admissibility unless it is plain error." *Reavis v. United States*, 395 A.2d 75, 79 (D.C. 1978). Here, we find no error, plain or otherwise.

conviction[13] and that Fenwick's identification of appellant was "so inherently weak or unreliable as to [be wholly] lack[ing in] probative value."[14] *Sheffield v. United States*, 397 A.2d 963, 967 (D.C. 1979). We cannot reach that conclusion given that Fenwick had known appellant for several years and testified that she recognized him by his eyes and voice.

## V.

Nichols, who was originally appellant's codefendant, pled guilty in a closed proceeding prior to trial. Appellant now contends that his "right to prepare an adequate defense" was violated by the closure of Nichols' guilty-plea proceeding.

---

[13] Appellant asserts that the trial court "compounded the error when it denied appellant's motion for judgment of acquittal after [Fenwick] . . . conceded that she had identified the masked robber only by his eyes and by a distinctive tattoo."

[14] Appellant cites to *Hunter*'s admonition that "eyewitness identification by strangers may often be fraught with peril." 692 A.2d 1370, 1377 (D.C. 1997). Here, however, the evidence showed that appellant was not a stranger to Fenwick; rather, Fenwick had known appellant for "four to six years." Moreover, *Hunter* confirms that even though trial judges must "be alert to any danger that the wrong man is in the dock[,] . . . [t]his responsibility does not . . . permit the judge to exclude probative evidence from the jury because the judge has doubts as to its reliability." *Id.*

In a motion he filed in the trial court to unseal the transcript from the Nichols proceeding, appellant asserted that when his trial counsel became aware of the proceeding, counsel assigned his interns to "sit in . . . the courtroom and to observe Mr. Nichols' demeanor and to take as many notes as possible concerning the specifics, the atmospherics, etc. of Mr. Nichols' guilty plea[,]" because counsel was unable himself to be present for the proceeding. However, the interns were not allowed to enter the courtroom where the plea agreement proceeding was taking place. At a hearing on the motion to unseal, the motions judge (Judge Keary, who also presided over Nichols's plea proceeding) stated that, after receiving the government's earlier motion to close the proceeding, she had made the findings required under *Nellson v. Bayly*[15] without difficulty. Judge Keary stated that had she known that appellant was "interested in being present," she would have afforded him an opportunity to challenge the government's motion to close the proceeding and "would have made a fuller record." Judge Keary denied appellant's motion to unseal the transcript of the plea proceeding, but allowed appellant to receive the government's proffer of facts from the proceeding.

---

[15] 856 A.2d 566, 567 (D.C. 2004) (citing *Press-Enterprise Co. v. Superior Court*, 474 U.S. 1, 14–15 (1986), and summarizing the holding of that case as follows: "to justify closure of a protected judicial proceeding, the trial court must find that closure serves a compelling interest; that in the absence of closure there is a 'substantial probability' that this compelling interest would be harmed; and that there are no alternatives that would adequately protect that compelling interest.")

Appellant does not now seek to have the transcript unsealed (a remedy that he asserts now could not "ameliorate the violation of [his] rights"), but seeks reversal of his convictions, asserting that the court closed the Nichols plea proceeding without giving the public notice and an opportunity to be heard,[16] and arguing that he was hampered in preparing his defense because his trial counsel's surrogates were prevented from "observ[ing] the live colloquy" in order to "evaluat[e] Nichols' body language, his credibility and his reaction to the prosecution proffer." Appellant also contends that the motions judge "failed to make any findings at all to support its conclusion that closure was necessary to preserve the defendant's fair trial right" (brackets omitted).

We need not determine whether the motions judge made the necessary findings[17] before restricting access to Nichols's plea agreement proceeding, or

---

[16] *See Globe Newspapers Co. v. Superior Court*, 457 U.S. 596, 609 n.25 (1982) ("[R]epresentatives of the . . . general public must be given an opportunity to be heard on the question of their exclusion.") (internal quotation marks omitted).

[17] *See McIntosh v. United States*, 933 A.2d 370, 376–77 (D.C. 2007) (explaining that before closing the courtroom, the trial court must first hear the views of counsel, and "then make a proper determination that strict and inescapable necessity" and "an overriding interest" "compel[] such a course of action," must consider reasonable alternatives to closing the proceeding, and must ensure that any closure is no broader than necessary to protect that interest)
(continued…)

whether it erred in declining to unseal the transcript, because appellant has not demonstrated that he suffered prejudice as a result of the closure of that proceeding.[18] The consolidated Eleventh Circuit case *United States v. Ochoa-Vasquez*, 428 F.3d 1015 (11th Cir. 2005), is instructive in our analysis. In that case, appellant Ochoa, who was charged with conspiracy for his participation in a drug cartel, intervened in the case against his alleged co-conspirator Bergonzoli and unsuccessfully moved the trial court in that case to unseal certain files, including plea colloquies, so that he could evaluate his co-conspirator as "a potential trial witness." *Id.* at 1022-25, 1027. Ochoa's arguments that the trial court erred were "unpersuasive" because he "failed to demonstrate that he would have called Bergonzoli as a witness, let alone that Bergonzoli's testimony would have made any difference in the outcome of the trial." *Id.* at 1027. Furthermore, even though the Eleventh Circuit concluded that the trial court had "violate[d] First Amendment standards" by sealing certain documents without making the requisite findings "to rebut the presumption of openness," it reasoned that the appropriate

---

 (…continued)
(alterations and internal quotation marks omitted); *see also United States v. Edwards*, 430 A.2d 1321, 1343–44 (D.C. 1981) (en banc).

[18] We are not concerned here with a violation of appellant's Sixth Amendment right as a defendant to have his own trial be a public proceeding, violation of which would constitute a structural error that we would presume to be prejudicial "'without need for further analysis in the context of the particular trial.'" *Barrows v. United States*, 15 A.3d 673, 678 (D.C. 2011).

remedy was to "reverse and remand" the orders denying access, not reversal of Ochoa's drug-trafficking conviction. *Id.* at 1030. A new trial, the remedy Ochoa sought, was not warranted, because Ochoa "has not shown prejudice." *Id.*

Here, appellant's statement that he was "foreclosed from evaluating Nichols' body language, his credibility and his reaction to the prosecution proffer" similarly falls short of an adequate showing of prejudice. The government did not call Nichols to testify at appellant's trial, so there was no cross-examination in which appellant might have been hampered by having been deprived of an opportunity to observe Nichols's demeanor at the plea proceeding. Further, appellant has not argued that any aspect of his defense at trial would have been different had he been allowed access to Nichols's plea-agreement proceeding. He has not stated that he wanted to call Nichols as a witness or that the ability to view Nichols in the proceeding would have altered his theory of his case or led him to introduce evidence at trial. Appellant's claim fails because he has not demonstrated, nor even argued, that there is a likelihood that the outcome of his trial would have been different if not for the closure of the plea-agreement proceeding. *Cf. Hurt v. United States*, 314 A.2d 489, 494 (D.C. 1974) (rejecting appellant's "professed impairment of his ability to prepare an adequate defense" where appellant's argument "rest[ed] purely on speculation").

## VI.

In the original indictment in this case, appellant was charged with obstruction of justice in violation of D.C. Code § 22-722 (a) (3) (B) (2012 Repl.) ("subsection (a)(3)"), which provides that "a person commits obstruction of justice if that person . . . [h]arasses another person with the intent to hinder, delay, prevent, or dissuade the person from . . . [r]eporting to a law enforcement officer the commission of, or any information concerning, a criminal offense." In the superseding indictment, appellant was instead charged with obstruction of justice in violation of D.C. Code § 22-722 (a) (6) (2012 Repl.) ("subsection (a)(6)"), which provides that "a person commits obstruction of justice if that person . . . [c]orruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding."

At a preliminary hearing, the government moved to dismiss the obstruction count under subsection (a) (6) and to proceed to trial under subsection (a) (3) (with the prosecutor explaining to the court that this court's then-very-recent decision in *Wynn v. United States*, 48 A.3d 181 (D.C. 2012), had "cast doubt" on whether a police investigation qualified as an "official proceeding" under subsection (a) (6)).

The trial court granted the government's motion, over appellant's objection that the superseding indictment "either explicitly or implicitly" had caused the original indictment to be dismissed.

On appeal, appellant suggests that the government was bound to proceed on the obstruction charge, if at all, under subsection (a) (6). He argues that he is entitled to reversal of his conviction because the evidence was insufficient as a matter of law to convict him under that subsection, since "there was no court case, no grand jury investigation, nor indeed any relevant charges pending against appellant" (and thus no occasion for him to obstruct "the due administration of justice in an[] official proceeding") at the times he warned Fenwick not to "snitch." We disagree with appellant's contention that the government could proceed on the obstruction charge only as alleged in the superseding (rather than the original) indictment.[19] Although we have not heretofore squarely addressed the issue, we agree with numerous federal appellate courts that an indictment remains pending against a defendant until it is dismissed by the trial court.[20] Thus, the return of the

---

[19] We need not and do not reach the issue of whether the evidence in this case could have supported a conviction under subsection (a) (6).

[20] *See*, *e.g.*, *United States v. Hickey*, 580 F.3d 922, 929–30 (9th Cir. 2009) (rejecting the appellant's contention that "a superseding indictment that omits a

(continued…)

superseding indictment in this case did not, as appellant's argument implies, automatically render the original indictment ineffectual or a nullity.[21] The original indictment remained pending against appellant because the trial court had not dismissed it at the time it ruled that the government could proceed on the obstruction count under subsection (a) (3).

---

(…continued)

charge against a defendant is essentially the same as dismissing that charge" and holding that "the government may elect to proceed on any pending indictment, whether it is the most recently returned superseding indictment or a prior indictment."); *United States v. Walker*, 363 F.3d 711, 715 (8th Cir. 2004) (noting that a "superseding indictment and the original indictment can co-exist," and citing with approval circuit court decisions holding that "a superseding indictment does not in effect dismiss the original indictment."); *United States v. Vavlitis*, 9 F.3d 206, 209 (1st Cir. 1993) ("It is clear that the grand jury's return of a superseding indictment does not void the original indictment."); *United States v. Bowen*, 946 F.2d 734, 736 (10th Cir. 1991) ("[finding] no authority which supports the proposition that a superseding indictment zaps an earlier indictment to the end that the earlier indictment somehow vanishes into thin air."); *United States v. Stricklin*, 591 F.2d 1112, 1115 n.1 (5th Cir. 1979) (explaining that where a superseding indictment was returned, and an original indictment was never dismissed, there were "technically two pending indictments against [the appellant], and . . . the government may select one of them with which to proceed to trial."); *United States v. Cerilli*, 558 F.2d 697, 700 n.3 (3rd Cir. 1977) (stating that the defendants' contention that "the issuance of [a] 'superseding' indictment necessarily constitutes dismissal of the original indictment" was "not convincing," because both indictments remained pending, "and the government may select one of them with which to proceed to trial.").

[21] *United States v. Rojas-Contreras*, 474 U.S. 231, 237 (1985) ("The term 'superseding indictment' refers to a second indictment *issued in the absence of a dismissal of the first*.") (Blackmun, J., concurring) (italics added).

We discern no basis for concluding that appellant was unfairly prejudiced by the court's ruling or that appellant or jurors were misled about the substance of the obstruction charge appellant faced. The original indictment clearly alleged, and the prosecutor's opening and closing arguments clearly indicated, that the government's theory of the crime was that appellant had tried to prevent Fenwick from reporting the robbery to the police. Similarly, the trial court instructed the jury that in order to convict appellant of obstruction, the government was required to prove that "the Defendant harassed Tierra Fenwick[,] [a]nd [that] . . . [t]he Defendant did so with the intent to hinder, delay or prevent Tierra Fenwick from reporting to a law enforcement officer the commission of a criminal offense and any information concerning a criminal offense."

For the foregoing reasons, appellant's convictions are affirmed

*So ordered.*