*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CF-0085

JOSHUA C. AUSTIN, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2019-CF2-016287)

(Hon. Rainey Brandt, Trial Judge)

(Argued February 6, 2024                      Decided May 23, 2024)

*Cecily E. Baskir* for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Chrisellen R. Kolb*, *Elizabeth H. Danello*, *Kristian L. Hinson*, and *Emma McArthur*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY, DEAHL, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: In October 2019, Emilie Marvil called 911 and reported that she had been pushed down and robbed in the stairwell of her apartment building about five minutes earlier by an individual she described to the 911 operator. Police officers found appellant Joshua C. Austin a short time later and

arrested him in connection with the incident. Before Mr. Austin's jury trial on multiple charges, Ms. Marvil died from unrelated causes. The trial court admitted the 911 call as evidence against Mr. Austin and Mr. Austin was convicted.

Under the Sixth Amendment's Confrontation Clause, criminal defendants enjoy the right to confront witnesses against them. The Clause was intended to preclude conviction in circumstances where the defendant was not given the opportunity to test the reliability of the witness's statements in the crucible of cross-examination. The Confrontation Clause therefore prohibits the admission of certain statements made outside the courtroom by witnesses who are unavailable to testify.

But not all out-of-court statements fall within the purview of the Confrontation Clause. Only those that are "testimonial" in nature—that is, akin to testimony that would be offered at trial in aid of prosecution—are constitutionally prohibited from being used against the defendant. Mr. Austin asks us to decide whether the statements in Ms. Marvil's 911 call were of this kind.

We agree with Mr. Austin that the statements Ms. Marvil made during the 911 call were testimonial and reject the government's argument that they were instead made with the primary purpose to assist the police in meeting an ongoing emergency. Because Ms. Marvil did not appear at trial, admitting her statements to the 911 operator into evidence violated Mr. Austin's Sixth Amendment rights. We therefore

reverse two of Mr. Austin's convictions—the convictions for which the government cannot demonstrate that the error was harmless beyond a reasonable doubt—and remand to the trial court for further proceedings.

## I. Background

### A. The Underlying Incident and Mr. Austin's Convictions

The evidence at trial supported the following. Ms. Marvil, who was sixty-eight years old, left her apartment building for a grocery market located approximately a block and a half away. Video footage from inside the market showed Ms. Marvil shopping for groceries. While Ms. Marvil was shopping, Mr. Austin entered the store and stood by a counter near the register.

After she finished shopping, Ms. Marvil placed her items on the counter, took out a green change purse, and paid the cashier. The cashier handed Ms. Marvil her change, which she then put into her change purse. The cashier packed Ms. Marvil's items in a white plastic grocery bag and handed the bag to Ms. Marvil. Ms. Marvil then left the store. After a few moments, Mr. Austin also left the store and walked toward his bicycle.

Ms. Marvil returned to her apartment building from the store. Video footage from her apartment building showed Ms. Marvil walking through the front door.

Mr. Austin arrived on his bike seconds after Ms. Marvil and grabbed the door just as it was closing. Mr. Austin followed Ms. Marvil through the lobby, up the stairs, and out of camera range. Approximately forty seconds after Mr. Austin walked out of camera range, he returned through the lobby from the same direction, walked out the door, and rode away on his bike. From the video footage, Ms. Marvil and Mr. Austin were the only two people who entered or exited the lobby during this period.

A few minutes later, at approximately 12:41 p.m., Ms. Marvil's neighbor, Esperanza Canales, arrived at the apartment building. Ms. Canales did not see anyone in the lobby or leaving the building at this time. Ms. Canales heard Ms. Marvil calling for help, saying, "help me, please, please." Ms. Canales found Ms. Marvil in the stairwell with her groceries and purse "[strewn] around on the ground" and "spouting blood on her hands." Ms. Canales asked Ms. Marvil if she was okay and if she wanted Ms. Canales to call an ambulance or the police. Ms. Marvil declined but asked Ms. Canales for help getting to her apartment. Although Ms. Canales had some difficulty, she eventually helped Ms. Marvil to her apartment.

About five minutes after the incident, Ms. Marvil called 911. As discussed in more detail below, Ms. Marvil described her assailant to the 911 operator as a tall,

thin, Black man wearing a cap and riding a black bike. Over Mr. Austin's objection, the trial court admitted the 911 call as evidence at trial and the government played the call recording for the jury.[1]

Metropolitan Police Department (MPD) Officers Norbert Dengler and Tirik Davis responded to Ms. Marvil's "priority one call for service involving a robbery, force and violence." After Officer Davis arrived at her apartment, Ms. Marvil gave him a description of her attacker and Officer Davis broadcast a "lookout." At trial, Officer Davis testified that Ms. Marvil described her attacker as a Black male in his mid-twenties, approximately 5'6" to 5'7" tall, with a "medium complexion" and a "[t]hin build, [wearing] dark clothing," and who was "[p]ossibly wearing a skull cap and was riding . . . a black bike without a kickstand."[2]    Officer Dengler

---

[1] The government played the call only in its opening statement (it tried to play it in its closing argument but encountered a technical issue). But the parties had stipulated both that the call was made and that the recording was authentic, and the trial court admitted it into evidence. In closing argument, the government told the jury that the call was admitted evidence that the jury could consider.

[2] The government did not elicit this description on direct examination but elicited only that Ms. Marvil had provided a description to Officer Davis. On cross-examination, defense counsel asked Officer Davis if he recalled certain details of Ms. Marvil's description of her assailant, apparently in an effort to show that Officer Davis was "not prepared" and "sloppy." The government objected and argued that defense counsel had opened the door for the government to play body-worn camera footage to refresh Officer Davis's recollection. The court allowed the government to "rehabilitate" Officer Davis on re-direct examination, where he

unsuccessfully canvassed the area for a suspect matching the lookout. Shortly thereafter, emergency medical technician Tekola Pettis arrived to treat Ms. Marvil's wounds, which included bruising and abrasions on her arms. At trial, Ms. Pettis testified that Ms. Marvil said that she had been assaulted in the hallway of her building.[3]

Inside Ms. Marvil's apartment, police recovered an empty green plastic change purse and a white plastic grocery bag that contained grocery items. Forensic analysis found three prints on the plastic grocery bag matching two of Mr. Austin's fingers and his left palm. The forensic analyst found no latent prints on the green plastic change purse.

Police eventually apprehended Mr. Austin, who was charged with (1) first-degree burglary of a senior citizen (D.C. Code §§ 22-801(a), -3601); (2) kidnapping of a senior citizen (D.C. Code §§ 22-2001, -3601); (3) robbery (of currency) from a senior citizen (D.C. Code §§ 22-2801, -3601); and (4) assault with intent to commit the robbery of a senior citizen (D.C. Code §§ 22-401, -3601).

---

testified to the description that Ms. Marvil gave him, without objection by Mr. Austin.

[3] Mr. Austin objected to Ms. Pettis's testimony as hearsay. The government responded that Ms. Marvil's statements were "made for medical diagnosis." The trial court agreed and overruled the objection. Mr. Austin does not challenge that ruling on appeal.

Ms. Marvil died in May 2021 from an unrelated, long-term illness. After a December 2021 trial, a jury convicted Mr. Austin of burglary, robbery, and assault with intent to commit robbery, and acquitted him of kidnapping. The trial court sentenced Mr. Austin to concurrent twenty-four-year terms of imprisonment for burglary and robbery, to be followed by five years of supervised release (the court did not impose a sentence for assault with intent to commit robbery because it merged with the robbery conviction).

Mr. Austin timely appealed.

### B.    The 911 Call and the Government's Motion in Limine

### 1.    The 911 Call

Like the jury, this court was provided with both the recording and a transcript of the 911 call. It proceeded as follows:

> *Operator*: D.C. 911. What's the location of your emergency?
>
> *Marvil*: I'm at 5922 13th Street Apartment 209.
>
> *Operator*: Ok, what section of the city are you in?
>
> *Marvil*: Northwest.
>
> *Operator*: Repeat your address for verification.
>
> *Marvil*: I'm sorry?
>
> *Operator*: Repeat your address for me.

*Marvil*: 5922 13th Street, Northwest, Apartment 209, DC 20011.

*Operator*: What's your telephone number?

*Marvil*: 202-686-0147.

*Operator*: Verified. What's your name, ma'am?

*Marvil*: Emilie E-M-I-L-I-E, last name Marvil M-A-R-V as in Victor-I-L.

*Operator*: Emilie, what's your emergency?

*Marvil*: I was just attacked in my apartment building walking up the stairs. He took my money, and he threw me down and hit me in the arms, and they are kind of bleeding now. But I just wanted to report that.

*Operator*: Ok. Do you know who he is?

*Marvil*: I've never seen him. I–

*Operator*: Did he have any weapons?

*Marvil*: I don't know. He threw me down part of the stairs.

*Operator*: Is he still there?

*Marvil*: No sir. He . . .

*Operator*: Ok.

*Marvil*: He got my, he dumped my package, my groceries onto the floor and pulled me down the stair and found my money. He had a bike with him.

*Operator*: Ok, give me his description. Was he . . . How long ago did it happen?

*Marvil*: About five minutes ago.

*Operator*: Ok. And give me a description. Was he Black, White, Hispanic, or Asian?

*Marvil*: He was Black and tall and thin. I think he had a cap on. He was riding a bike. He came up behind me in my building. Our security door doesn't work.

*Operator*: Ok.

*Marvil*: So he followed me into the building.

*Operator*: Did you see what type of shirt he had, what type of shirt or pants he had on?

*Marvil*: No, I'm sorry I didn't.

*Operator*: You said, you said . . . And did you see the color of his bike?

*Marvil*: It was a black bike, and–

*Operator*: He left on a black bike? Did you see what direction he went in?

*Marvil*: No, I was in the stairwell. I only saw him coming in, and because the door doesn't lock, he just kept following me.

*Operator*: Ok. Do you need medical, do you need medical treatment, ma'am?

*Marvil*: I'm going to clean up the abrasions myself and the blood. And I'll be fine.

*Operator*: Oh, ok. And so you said the security door is not working so police don't need any access codes to get into your building?

*Marvil*: No.

*Operator*: All right.

*Marvil*: And he has a little, oh no, well, he's got $60 with him, that's what he has.

*Operator*: Ok, give me one second. He just stole $60?

*Marvil*: Yes, that's what he got. He got really, really angry because I didn't have a wallet.

*Operator*: Ok. All right, I've already sent your call for dispatch, okay. Give us a call back if there are any changes or any updates. The next available officer will be dispatched and will respond to your location. Ok?

*Marvil*: Oh, what does dispatched mean, please?

*Operator*: It's sent, it's sent, it's sent out, like, to the queue for officers.

*Marvil*: Will they come to my door?

*Operator*: Yes, ma'am.

*Marvil*: Okey dokey.

*Operator*: All right.

*Marvil*: Thank you sir.

*Operator*: No problem.

*Marvil*: I need to go cry now.

## 2.     The Government's Motion in Limine and the Trial Court's Ruling

The government moved to admit Ms. Marvil's 911 call, arguing that the call fell under the present-sense-impression and excited-utterance exceptions to the rule against hearsay. Mr. Austin opposed the admission of the call, asserting that the call was testimonial and that its admission would therefore violate the Sixth Amendment's Confrontation Clause. Mr. Austin also objected to the 911 call as hearsay.

After briefing and argument by the parties, the trial court first ruled that the admission of the 911 call did not run afoul of the Sixth Amendment because it was not "testimonial." *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); *Davis v. Washington*, 547 U.S. 813, 822 (2006). The trial court relied on a number of factors. It first examined Ms. Marvil's demeanor during the call. According to the court, Ms. Marvil was "soft-spoken, almost in a timid sort of way" and it was "very clear [that] she[ was] having difficulty breathing" because she occasionally "gasp[ed] in certain places for breath." Ms. Marvil was "rambling" and spoke in a "stream of consciousness . . . , most of which [wasn't] directly in response to a question." According to the trial court, Ms. Marvil was "in shock," had to "bite back her emotions" and, toward the end of the call, "her voice [was] about to fracture[.] The dam [was] about to burst." The trial court acknowledged, however, that Ms. Marvil was not "crying," "agitated," or "overly emotional." The court explained this by stating that "[p]eople behave differently when they are in shock" and that Ms. Marvil "disassociate[d] herself from the pain" until she was "in a safe space to be able to process what [ ] just happened to her."

Second, the court considered the "motivation of [Ms. Marvil] and the intent of . . . 'the interrogation.'" Taking "the first six queries that the 911 operator went through with her" as examples, the court concluded that "th[e] 911 operator [was] asking basic questions trying to figure out where [Ms. Marvil] is and who she is."

The trial court found these first questions significant because the purpose of the call was to "gather[ ] information to help the police" and avoid "send[ing] the police into a situation where they [didn't] know what [was] going . . . on."

Finally, the court examined the substance of the call from the perspective of the 911 operator. Based on the answers that Ms. Marvil gave to several of the questions, the court found that "the 911 operator [had] no clue whether or not there [were] any weapons involved" but knew that Ms. Marvil was bleeding and that there was an "angry mystery man" who could "still [be] in the building." Based on the information provided by Ms. Marvil, the court found that "a rational inference can be drawn that would lead that 911 operator to think" that there was an emergency.

On these bases, the trial court ruled that the 911 call was nontestimonial for Sixth Amendment purposes because the "primary purpose . . . for the 911 call was to meet an ongoing emergency."

The court also ruled that the call did not violate the rule against hearsay because it was an excited utterance. The court placed significant weight on the temporal proximity of the call to the robbery—five minutes—and the "spontaneity and sincerity of the statement[s]." For largely the same reasons, the court also concluded that the 911 call fell under the present sense impression exception to the hearsay rule.

As noted, again at trial the court overruled Mr. Austin's Confrontation Clause and hearsay objections and admitted the 911 call as evidence.

## II.    Discussion

Mr. Austin challenges the trial court's admission of the 911 call. He argues that the call was testimonial and that its admission violated his Sixth Amendment rights. The government, meanwhile, argues that the trial court properly concluded that the 911 call was nontestimonial. Alternatively, the government contends that, even if the admission of the 911 call was error, the error was harmless.

We agree with Mr. Austin that the 911 call was testimonial and that the admission of the call therefore violated his Sixth Amendment rights. We further conclude that the government has failed to demonstrate that the error was harmless beyond a reasonable doubt as to Mr. Austin's robbery conviction and his assault-with-intent-to-rob conviction. We are satisfied beyond a reasonable doubt, however, that, even without the erroneous admission of the 911 call, a rational jury would have found Mr. Austin guilty of burglary and simple assault as a lesser-included offense of assault with intent to rob. We therefore reverse Mr. Austin's robbery and assault-

with-intent-to-rob convictions, affirm Mr. Austin's burglary conviction, and remand for entry of a conviction for assault and resentencing.[4]

## A. Standard of Review

"This court reviews *de novo* whether the admission of certain evidence violates a defendant's constitutional rights under the Confrontation Clause." *Carrington v. District of Columbia*, 77 A.3d 999, 1003 (D.C. 2013). We review the trial court's factual findings for clear error. *See Freeman v. United States*, 273 A.3d 879, 883 (D.C. 2022).

## B. Whether Admission of the 911 Call Was Error

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. This constitutional mandate bars the admission of certain statements made by a declarant who does not appear at trial "unless [the declarant] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Davis v. Washington*, 547 U.S. 813, 821 (2006) (internal

---

[4] Mr. Austin separately argues that the trial court erred in admitting the 911 call under an exception to the hearsay rule. Because we conclude that admitting the 911 call violated Mr. Austin's Sixth Amendment rights (and therefore apply the stricter constitutional harmless error standard articulated in *Chapman v. California*, 386 U.S. 18, 23-24 (1967)), we need not consider Mr. Austin's evidentiary claim.

quotations omitted). "[T]he basic objective of the Confrontation Clause[ ] . . . is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011); *see Wills v. United States*, 147 A.3d 761, 766-67 (D.C. 2016).

The Confrontation Clause does not bar all out-of-court statements. Only "testimonial statements" will "cause the declarant to [become] a 'witness' within the meaning of the Confrontation Clause." *Davis*, 547 U.S. at 821.[5] For determining

---

[5] "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Id.* Accordingly, even if an out-of-court statement does not implicate the Confrontation Clause, it must still comply with the rules of evidence. *Ohio v. Clark*, 576 U.S. 237, 245 (2015).

When an out-of-court statement *does* implicate the Confrontation Clause (and the defendant has not otherwise had an opportunity to cross-examine the witness), compliance with the rules of evidence does not offer an independent path to admissibility. The Court in *Crawford v. Washington* squarely rejected such an end-run around the Sixth Amendment, as it "would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices." 541 U.S. 36, 51 (2004). *See id*. at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protections to the vagaries of the rules of evidence . . . .").

Here, the trial court suggested that the compatibility of the 911 call with the rules of evidence was a sufficient basis for its admission as evidence, irrespective of whether it was testimonial for purposes of the Confrontation Clause. *See* 5/27/21 Tr. at 34 ("But even if you don't believe that [the 911 call is] not testimonial, it would survive a hearsay objection because it is both a present sense impression and an excited utterance."). A testimonial, out-of-court declaration is inadmissible,

whether a statement is testimonial, the Supreme Court developed the "primary purpose" test. *Clark*, 576 U.S. at 244 (citing *Davis*, 547 U.S. at 820). Under this test, statements are testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822; *see Wills*, 147 A.3d at 767. On the other hand, statements are nontestimonial if, among other things, "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822.[6]

Courts should consider at least three factors in determining whether the primary purpose of the questioning is to assist police in meeting an ongoing emergency: (1) "the circumstances in which the encounter occurs," (2) "the statements and actions of the parties," and (3) the formality of the encounter. *Bryant*, 562 U.S. at 359, 366. All Confrontation Clause inquiries are objective. *Id.* at 360.

---

however, unless it complies with *both* the Sixth Amendment *and* the rules of evidence.

[6] Statements can also be nontestimonial when made in circumstances other than ongoing emergencies. *Bryant*, 562 U.S. at 358; *see, e.g.*, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) (holding that business and public records are nontestimonial). Here, the trial court admitted the 911 call on the ground that it was directed at responding to an ongoing emergency and the government defends the trial court's ruling solely on that ground. We therefore confine our analysis to that context.

"The government bears the burden of establishing that a proffered out-of-court statement made by a non-testifying witness is not testimonial." *Andrade v. United States*, 106 A.3d 386, 388 (D.C. 2015).[7]

### 1. Circumstances Surrounding the 911 Call

Confrontation Clause analysis should begin "with the circumstances in which [the declarant] interacted with the police." *Bryant*, 562 U.S. at 362. "[T]he existence of an ongoing emergency at the time of an encounter between an individual and the police is among the most important circumstances informing the primary purpose of an interrogation." *Id.* at 361 (internal quotations omitted). The presence of an emergency "is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.'" *Id.* (quoting *Davis*, 547 U.S. at 822) (alteration in original); *see id.* at 370 ("The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining

---

[7] For Sixth Amendment purposes, we treat 911 operators as law enforcement officers or agents thereof, rather than private persons. *See Tyler v. United States*, 975 A.2d 848, 854 (D.C. 2009) ("[A] 911 operator's questions to a caller may constitute police interrogation[.]"); *Smith v. United States*, 947 A.2d 1131, 1134 (D.C. 2008) (assuming that questions from 911 operator constituted police interrogation). Inquiries by a 911 operator are, therefore, a species of police interrogation.

whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation.").

"[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 363. The Supreme Court has identified several non-exhaustive factors in considering whether an ongoing emergency existed at the time of the interrogation. These factors include the temporal proximity of the alleged crime to the declaration, *id.* at 374; the physical proximity of the defendant to the declarant, *id.* at 373; the type of weapon, if any, employed, *id.*; the medical condition of the declarant, *id.* at 364-65; the declarant's state of mind and motives in speaking to the police, *id.* at 361-62; and any continued threat posed to first responders and the public, *id.* at 363.

As noted above, the circumstances surrounding the declaration "must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight." *Id.* at 361 n.8. Thus, "[i]f the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause." *Id.* at 361 n.8. The presence of an emergency is relevant only to the extent that a reasonable person

would believe than an emergency existed at the time the declarant interacted with the police. *See id.* at 361-62.

Here, a reasonable person—from the perspective of either Ms. Marvil or the 911 operator—would not have believed that there was an ongoing emergency at the time of the 911 call. Several considerations support this conclusion.

First, Ms. Marvil's 911 call occurred at a temporal remove from the robbery. Cases assessing whether a statement is testimonial under the Confrontation Clause often focus on whether the declarant "was speaking about events *as they were actually happening*" or were "describing past events." *Davis*, 547 U.S. at 827 (emphasis in original) (alterations and internal quotations omitted); *see, e.g.*, *Wills*, 147 A.3d at 770 ("the fact that the incident was *over*," even if it was not "*long* over," supported a determination that statements were testimonial); *United States v. Graham*, 47 F.4th 561, 569 (7th Cir. 2022) ("Moore's statements to the police were made spontaneously . . . . Moore identified a dangerous individual and described his crime as it was actually happening. She told the officers that Graham presently had 'a 19-year-old prostitute' in his room at the motel and was 'prostituting bitches.'"); *United States v. Cadieux*, 500 F.3d 37, 41 (1st Cir. 2007) (finding statement to 911 operator nontestimonial where declarant was "speaking about

events in real time, as she witnessed them transpire through a window in her home; at no point is there a description of past events").

Here, approximately five minutes had elapsed between the robbery and the call.[8] As the trial court noted, Ms. Marvil had time to "pick herself up or be helped up, finish climbing [the stairs] up to her apartment, get to her apartment, unlock the door, put down her groceries, and get to a phone." The 911 operator also was aware that the robbery occurred at some time in the past: Ms. Marvil described the robbery in the past tense and the 911 operator similarly framed his or her questions to Ms. Marvil in the past tense. Rather than calling 911 "for help against a bona fide physical threat," Ms. Marvil's call is more accurately described as "a narrative report of a crime" that occurred in the past. *Davis*, 547 U.S. at 827; *see Wills*, 147 A.3d at 770.

---

[8] The precise amount of time between the assault and the call is unclear. During the call, Ms. Marvil stated that the incident had occurred "about five minutes" prior. The trial court found that the call occurred "within five, six minutes of" the incident. The government's brief suggests yet another number—about ten minutes—based on surveillance video time-stamps. We assume that the call occurred approximately five minutes after the incident, which is consistent with Ms. Marvil's estimate and, in any event, the most favorable timeframe for the government's position that the call was nontestimonial due to temporal proximity to the event.

The trial court found the passage of five minutes inconsequential because the call occurred "within a reasonable time period for an elderly woman to" "pick herself up or be helped up, finish climbing up to her apartment, get to her apartment, unlock the door, put down her groceries, and get to a phone." The significance of the temporal proximity between the crime and the declaration, however, is not based on the reasonableness of the declarant's actions. Rather, temporal proximity is meaningful for Confrontation Clause purposes because during an emergency, the participants focus on ending a threatening situation, not "'prov[ing] past events potentially relevant to later criminal prosecution.'" *Bryant*, 562 U.S. at 375 (quoting *Davis*, 547 U.S. at 822). An intervening period of time between the crime and the declaration, however understandable given the circumstances, might allow the declarant to reflect on the crime, shifting his or her focus away from "resolving an ongoing emergency" and toward a retrospective evaluation or analysis of past events. *Id.* at 363.

To be sure, declarants might not always be able to meaningfully reflect on the situation even given an intervening period of time after a crime. *See, e.g.*, *Bryant*, 562 U.S. at 349, 371, 375 (holding that complainant's statement to responding officers while he was "lying on the ground next to his car in a gas station parking lot[ ] [with] . . . . a gunshot wound to his abdomen [and] appeared to be in great pain" was nontestimonial even though there "was no criminal conduct occurring[,] [n]o

shots were being fired, . . . nor were any witnesses seen cowering in fear or running from the scene"); *United States v. Arnold*, 486 F.3d 177, 189 (6th Cir. 2007) ("While Gordon left the house and entered [a] car around the corner before making the 911 call rather than trying to make the call in [the assailant's] presence, that did not make the emergency less real or less pressing."); *Tyler*, 975 A.2d at 855 (holding statement made to 911 operator was nontestimonial when made "right after the caller . . . saw the shooting"). In such cases, however, some additional trying circumstance surrounding the declaration—such as a continued threat to the victim, *Arnold*, 486 F.3d at 189-90; a medical emergency, *Bryant*, 562 U.S. at 375; *Tyler*, 975 A.2d at 855; or the presence of firearm or a threat to responding officers or public safety, *Bryant*, 562 U.S. at 372-74—tended to focus the declarant on events other than the past crime or otherwise outweighed the passage of time between the crime and the declaration for purposes of finding an ongoing emergency. As explained below, none of those additional circumstances was present here. Rather, the crime ended, five minutes passed, and only then did Ms. Marvil call 911. We therefore weigh the five-minute interval between the robbery and Ms. Marvil's call in favor of finding that the emergency had subsided.

Second, Ms. Marvil was physically separated from the scene of the crime. With the help of Ms. Canales, she had returned to her apartment before the call. Although we cannot necessarily describe Ms. Marvil's apartment as "tranquil,"

*Davis*, 547 U.S. at 827, it afforded her a degree of separation from the crime and protection from further harm.[9]

Additionally, both Ms. Marvil and the 911 operator knew that Mr. Austin had left the apartment building immediately after the robbery, presumably on his bike. Mr. Austin's retreat distinguishes this case from those in which the presence or close proximity of the perpetrator strongly suggested an ongoing emergency, even where the victim had some physical separation from the assailant. *See, e.g.*, *Lewis v. United States*, 938 A.2d 771, 780-81 (D.C. 2007) (finding an ongoing emergency where assaultive spouse was still on the scene when police arrived); *United States v. Robertson*, 948 F.3d 912, 916-17 (8th Cir. 2020) (finding an ongoing emergency where "911 caller breathlessly described the shooting by saying Robertson 'just now shot at Urva' and pleaded with the dispatcher, saying 'Hurry, hurry!  He's going to come back with a gun!'"); *United States v. Johnson*, 509 F. App'x 487, 494 (6th Cir.

---

[9] The government asserts that "[t]he colloquy between [Ms.] Marvil and the operator never established that" Ms. Marvil was in her apartment when she made the call.  We disagree.  The trial court appeared to conclude that Ms. Marvil made the phone call from her apartment.  This finding aligns with Ms. Canales's testimony that she helped Ms. Marvil get to her apartment after finding her in the stairwell. Additionally, Ms. Marvil gave the 911 operator her specific apartment number when asked about the "location of [her] emergency," and she asked the operator if the responding officers were coming to "my door."  Ms. Marvil also used the past tense when describing when she "*was* in the stairwell."  Accordingly, we conclude that the record supports—and that a reasonable person in the 911 operator's shoes would have understood—that Ms. Marvil was calling from her own apartment.

2012) (finding an ongoing emergency where 911 caller "describe[d] an ongoing situation requiring police assistance: 'He's going towards McDougal and Gratiot. He got a gun . . . . He's walking towards McDougal now.'") (ellipses in the original). Rather, as with the later parts of the 911 call in *Davis*, Mr. Austin's departure from the crime scene suggests that there was no ongoing emergency. 547 U.S. at 828-29.

The government draws a different inference from the facts with respect to Ms. Marvil's safety. It contends that, because Ms. Marvil did not know Mr. Austin's precise location at the time of the call, he could still have been nearby. But the government, which bore the burden of proof, presented no evidence that Ms. Marvil or the 911 operator had reason to believe that Mr. Austin would return to the apartment building. Indeed, contrary to the government's framing, Ms. Marvil's statement to the 911 operator was clear: when asked if Mr. Austin was "still there," she responded "No sir." True, she did not see in what direction Mr. Austin fled. Nevertheless, Ms. Marvil appeared confident that he had in fact left the premises. Although it is theoretically possible that Mr. Austin could have been nearby or even returned to the apartment building, "[t]here was no evidence that [Ms. Marvil] had specific reason to fear that [the assailant] was planning to return soon[.]" *Andrade*, 106 A.3d at 391; *cf. Smith v. United States*, 947 A.2d 1131, 1133 (D.C. 2008) (finding ongoing emergency where declarant "did not know [perpetrator's] location,

could not know if the attack had ended, and feared he might return"). As the government itself described it at trial, Ms. Marvil "knew that [Mr. Austin] was already long gone" by the time Ms. Marvil called 911.

Third, there was no evidence that Mr. Austin used a weapon during the incident. "[T]he duration and scope of an emergency may depend in part on the type of weapon employed." *Bryant*, 562 U.S. at 364. The use of a firearm, for example, might stretch the duration of an emergency because the victim might not be safe even if he or she is at a physical or temporal remove from the crime scene or the perpetrator. *See id.* at 373 ("The physical separation that was sufficient to end the emergency in *Hammon* [*v. Indiana*, 547 U.S. 813 (2006), where the assailant used only his fists] was not necessarily sufficient to end the threat in this case; Covington was shot through the back door of Bryant's house.").

When asked if Mr. Austin had any weapons, Ms. Marvil responded that she did not know. The lack of a reported weapon, combined with the fact that Mr. Austin fled the scene immediately after the robbery, would have suggested to a reasonable person in the position of the 911 operator that Ms. Marvil was safe at the time she made the call.

The government contends that Ms. Marvil's lack of knowledge whether Mr. Austin had a weapon "support[s] an ongoing-emergency finding." Inferring an

emergency from an absence of information would expand and distort the concept of an emergency beyond its function in this context, and we have already rejected the argument that an ongoing emergency can be inferred from the lack of knowledge about whether there was a weapon. *See Andrade*, 106 A.3d at 389 (statement testimonial where the police had no "reason to believe that a weapon had been involved in the incident"). Where, as here, there is no other evidence suggesting that the assailant used or possessed a weapon (and where the declarant is physically separated from the assailant), this factor weighs in favor of finding that the emergency has subsided.[10]

Fourth, the injuries that Ms. Marvil sustained during the incident do not support a finding that an emergency was ongoing at the time of the 911 call. We consider the medical condition of the victim because it "sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." *Bryant*, 562 U.S. at 364-65. In *Bryant*, for example, the police responded to a "call that a man had been shot" and whom officers found "lying in a gas station parking lot

---

[10] Relatedly, in the absence of evidence that Mr. Austin was armed or was engaging in a spree of robberies, and in light of the evidence that he appeared to target Ms. Marvil when he saw her in the market, we do not see this as a case where "the threat to the first responders and public" was likely to have "continue[d]." *Bryant*, 562 U.S. at 363.

bleeding from a mortal gunshot wound to his abdomen." *Id.* at 371, 375. The victim in *Bryant*, who "appeared to be in great pain, and spoke with difficulty," repeatedly asked "questions about when emergency medical services would arrive." *Id.* at 349, 375. "From this description of his condition and report of his statements," the Court found that "a person in [the victim's] situation would [not] have had a primary purpose to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 375 (internal quotations omitted). In other words, the victim in *Bryant*—mortally wounded and in great pain—was almost certainly more interested in his own survival than in establishing a record for a criminal prosecution occurring long after the incident.

Ms. Marvil's wounds—bruising and abrasions on her arms—are distinguishable from the injuries in *Bryant* and do not rise to a level that would undermine a testimonial purpose. Indeed, Ms. Marvil herself believed that her injuries were not significant enough to warrant medical attention. She expressly declined medical attention twice: first when Ms. Canales arrived shortly after the robbery and again when the 911 operator asked if she needed medical treatment. The same holds true from the 911 operator's perspective. When the operator asked about the nature of Ms. Marvil's emergency, Ms. Marvil responded that the perpetrator "threw [her] down and hit [her] in the arms, and they are kind of bleeding now." But when the operator inquired directly about the need for medical attention,

Ms. Marvil stated that she was "going to clean up the abrasions myself and the blood. And I'll be fine." This factor therefore militates against a finding of an ongoing emergency. *See Wills*, 147 A.3d at 768 ("any prospect that [the police officer] would need to act to protect the complainant or seek medical treatment on her behalf faded when she said—and he saw—she was okay").

Fifth, we consider Ms. Marvil's state of mind and motives during the call. *Bryant*, 562 U.S. at 361-62, 368-69. As a proxy for this inquiry, this court has looked to a complainant's emotional state in assessing whether there was an ongoing emergency. *See Wills*, 147 A.3d at 768 (whether the complainant was "crying and breathing heavily" were "facts that in some cases could suggest an ongoing emergency"); *Andrade*, 106 A.3d at 389 (that the complainant "was crying and appeared obviously upset" provided "some support for a finding of ongoing emergency"); *Frye v. United States*, 86 A.3d 568, 573 (D.C. 2014) (stating that the declarant's "acute emotional distress" supported a finding that her statement was nontestimonial).

The trial court assessed Ms. Marvil's demeanor on the recorded call as supporting a finding of an ongoing emergency. It noted several characteristics of the audio indicating Ms. Marvil's emotional state. For example, it found that Ms. Marvil was "soft-spoken," had "difficulty breathing," and was "trying to hold

back her emotions enough to have a conversation with" the 911 operator. Her answers, according to the trial court, were a "rambling stream of consciousness dump." The court found that Ms. Marvil was, in a word, in "shock."

Having listened to the call ourselves, we find much of the trial court's description to be unsupported. Although we review the trial court's findings of fact for clear error, and the existence of a recording does not change our standard of review, *see Hawkins v. United States*, 248 A.3d 125, 130 (D.C. 2021), we have an "obligation to conscientiously review the trial court's finding based on the record presented," *id*. Based on that review, Ms. Marvil's responses to the 911 operator struck us as relatively calm, measured, lucid, and linear. They were, at least, readily distinguishable from statements we have found nontestimonial. *See, e.g.*, *Frye*, 86 A.3d at 570, 573 (declarant was "shaking" and "crying" during her "emotion-laden" narration of the events); *Lewis*, 938 A.2d at 774 (declarant was "excited, crying, agitated, very emotional, and very, very upset") (internal quotations omitted). In the trial court's view, Ms. Marvil "disassociate[d] herself from the pain," displaying a calm demeanor until she could reveal her true emotions after the call. Under that approach, however, a complainant's state of mind would be assessed based not on objective evidence but on the trial court's subjective conjecture about their inner thoughts and feelings notwithstanding any outward manifestations. *Cf. Mayhand v. United States*, 127 A.3d 1198, 1202 (D.C. 2015) ("Our restrictions on the use of

hearsay are no more to be avoided by determinations that the declarant who appeared outwardly calm suffered hidden inner turmoil than by 'rote recitations that the declarant was upset or excited or afraid.'" (quoting *Odemns v. United States*, 901 A.2d 770, 777 (D.C. 2006)).

In any event, even assuming that Ms. Marvil was in "shock" to some degree, we conclude that the state of mind evidence in this case does not rise to the level required to demonstrate that she could not "form a falsehood" or "eliminate the possibility of fabrication, coaching, or confabulation[.]" *Bryant*, 562 U.S. at 361-62 (internal quotations omitted). *See Hammon*, 547 U.S. at 819, 832 (holding that the "somewhat frightened" complainant's on-the-scene statements were testimonial); *Wills*, 147 A.3d at 772 ("evidence that a complainant was distressed has not defeated a Confrontation Clause claim"); *Andrade*, 106 A.3d at 391 (finding statements testimonial even though declarant was "very upset").[11]

Considering the factors on the whole, we conclude that the emergency had subsided by the time Ms. Marvil called 911.

---

[11] We express no view, of course, on whether Ms. Marvil actually engaged in fabrication or even had the intent to engage in fabrication. The question for Confrontation Clause purposes is whether the circumstances gave rise to the *possibility* of fabrication such that the lack of opportunity for cross-examination poses risks of constitutional dimension.

## 2. Statements and Actions of the Parties

Although "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry," it provides essential context for understanding the statements and actions of the parties. *Bryant*, 562 U.S. at 374; *see also Davis*, 547 U.S. at 827 (inquiring into the "nature of what was asked and answered"). In general, at least the initial interrogation conducted in connection with a 911 call is "ordinarily not designed primarily to establish or prove some past fact." *Davis*, 547 at 827 (internal quotations and alterations omitted). Nevertheless, there are circumstances in which a 911 call simply "provide[s] a narrative report of a crime absent any imminent danger," and is therefore testimonial. *Id.*

The substance of Ms. Marvil's statements suggests that her primary purpose in making the 911 call was to establish facts about a past event that could be relevant in a future prosecution, particularly when viewed in the absence of an ongoing emergency. Three of Ms. Marvil's statements support this interpretation.

First and most importantly, Ms. Marvil called 911 after the crime was over to report that the robbery had occurred. *See id.* (concluding that a 911 call providing "a narrative report of a crime" is likely testimonial). In fact, the first substantive thing Ms. Marvil did on the 911 call was briefly describe the incident and say that she "just wanted to report" it. *See Wills*, 147 A.3d at 769 ("the complainant's

statement that Mr. Wills had taken her property was a straightforward reporting of a past event that police had a duty to investigate"). Second, Ms. Marvil expressly declined medical treatment, telling the 911 operator that she was "going to clean up the abrasions [herself] and the blood" and that she would "be fine." This further suggests that Ms. Marvil's primary purpose in making the call was not to resolve any emergency but rather to report a past event. *See id*. at 768-69 (finding it significant that the complainant said that she was "okay"). Third, Ms. Marvil made several remarks consistent with a criminal investigation. For example, Ms. Marvil described her assailant in detail, noting that he was "Black and tall and thin" with "a cap on" and that he was riding "a black bike." Similarly, Ms. Marvil provided important details of the robbery, including that he took $60, "threw [her] down and hit [her] in the arms," and "dumped [her] package, [her] groceries onto the floor." These responses are closer to a "deliberate recount[ing]" of how "past events began and progressed" than to a "cry for help." *Davis*, 547 U.S. at 830, 832.

We recognize, of course, that statements regarding the identity of an assailant or the facts of a crime might not necessarily indicate a testimonial purpose. *See id*. at 827 (noting that "even [ ] the operator's effort to establish the identity of the assailant" was necessary to resolve a present emergency because "dispatched officers [would want to] know whether they would be encountering a violent felon") (emphasis omitted). This is especially so when law enforcement officers need to

apprehend the perpetrator during an ongoing emergency or prevent him or her from causing further harm. *See id.*; *see also Bryant*, 562 U.S. at 375. But where there is no "immediate threat" to the declarant or the public, *Davis*, 547 U.S. at 830, statements regarding the identity of the assailant or the details of the crime suggest a testimonial purpose to "prove past events potentially relevant to later criminal prosecution," *id.* at 822. *See, e.g.*, *United States v. Brooks*, 772 F.3d 1161, 1169 (9th Cir. 2014) (call from officer "to ask whether someone matching a certain description was present" would lead a reasonable person to assume that "the inquiry [was] related to a criminal investigation"); *Ramirez v. Tegels*, 963 F.3d 604, 615-16 (7th Cir. 2020) (concluding that statements "such as those about where the assault happened and the identity of [the] abuser" were for the primary purpose of proving past events for later use at trial).

The statements of the 911 operator, on the other hand, were more mixed. A number of the 911 operator's initial questions were aimed at assessing Ms. Marvil's immediate situation and gauging the presence of an emergency. *See Davis*, 547 U.S. at 832 (noting that "initial inquiries" may "often . . . produce nontestimonial statements") (emphasis omitted). The operator asked basic questions such as Ms. Marvil's address, her telephone number, and the nature of her "emergency." The operator then asked Ms. Marvil about the perpetrator: "Do you know who he is?"; "Did he have any weapons?"; "Is he still there?" To a reasonable person, the

911 operator would have asked these initial questions for the purpose of obtaining critical, real-time information about the situation and to ensure the safety of Ms. Marvil and any first responders who may arrive.[12]

The 911 operator's questions took a turn, however, after he learned that the incident occurred several minutes before the call and that the assailant had left the scene. From that point forward, most of the 911 operator's substantive questions focused on obtaining "a description" of the assailant. The operator asked, for example, "Was he Black, White, Hispanic, or Asian?"; "Did you see what type of . . . shirt or pants he had on"; "[D]id you see the color of his bike?" A reasonable

---

[12] Of course, questioning can "begin[ ] as an interrogation to determine the need for emergency assistance" and later "evolve into [an interrogation which provides] testimonial statements." *Davis*, 547 U.S. at 828-29 (internal quotations omitted). "This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute." *Bryant*, 562 U.S. at 365. In such situations, it might be possible to admit nontestimonial statements while redacting or excluding testimonial statements.

Here, the parties do not ask us to consider whether certain portions of the 911 call would be nontestimonial if separated from the testimonial remainder. Nor is it obvious to us that the initial questions and answers were nontestimonial. *See Davis*, 547 U.S. at 832 (noting that, although "initial inquiries" often "produce nontestimonial statements," where a declarant's "statements [are] neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were . . . 'initial inquiries' is immaterial"). We therefore assess the 911 call as a whole.

person would understand these questions—asked at a point when there was no ongoing emergency or immediate threat to Ms. Marvil—as indicative of establishing a record for a criminal investigation or prosecution.

Taken together—and with an eye to the fact that there was no ongoing emergency at the time of the call—we conclude that the "nature of what was asked and answered," *Davis*, 547 U.S. at 827, indicates that the primary purpose of the call was to recount past events to aid a criminal investigation or prosecution. Stated differently, the substance of the call did not suggest a "cry for help" or an effort to enable a police response to resolve an "immediate threat." *Id.* at 830, 832.

### 3. Formality of the 911 Call

Finally, we consider the formality of the 911 call. The formality of an interrogation may indicate a testimonial purpose. *Bryant*, 562 U.S. at 366. A formal encounter between the declarant and police "suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* (internal quotations omitted). Thus, "testimonial statements of the most formal sort—sworn testimony in prior judicial proceedings or formal depositions under oath—" clearly indicate a testimonial purpose. *Davis*, 547 U.S. at 825-26. On the

other hand, "frantic answers [ ] provided over the phone, in an environment that was not tranquil" or safe, suggest a nontestimonial purpose. *Id.* at 827.

Here, although Ms. Marvil was not participating in a prepared, stationhouse interrogation, she called 911 several minutes after the incident to "report" that the robbery had occurred. *Id.* (noting that one "might call 911 to provide a narrative report of a crime absent any imminent danger") (emphasis omitted). Ms. Marvil spoke from a location of relative safety and in a measured tone to report a past event. Accordingly, this factor too weighs in favor of deeming the statements testimonial. *See Wills*, 147 A.3d at 771 (even though questioning was not "especially formal," complainant's response was testimonial because it "deliberately reported—in response to a police officer's question—how a potentially criminal past event occurred" (internal quotation marks and alteration omitted)).

\* \* \*

Viewing the factors holistically, we conclude that the government "did not carry its burden of establishing that the primary purpose of the questioning . . . was to enable the police to meet an ongoing emergency." *Andrade*, 106 A.3d at 391. Accordingly, the statements made during the 911 call were testimonial. Because Ms. Marvil was unavailable to testify, and Mr. Austin did not have a prior

opportunity to cross-examine her, admitting the 911 call as evidence at trial violated Mr. Austin's Sixth Amendment rights.

### C.     Whether the Error Was Harmless Beyond a Reasonable Doubt

"Having found a Confrontation Clause error, we must reverse appellant's conviction[s] unless we find the error harmless beyond a reasonable doubt." *Jenkins v. United States*, 75 A.3d 174, 192 (D.C. 2013); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (holding that Confrontation Clause errors are "subject to *Chapman* harmless-error analysis"). This standard is a demanding one. To satisfy the constitutional harmless error standard, the government must show that "the verdict was surely unattributable to the erroneously admitted evidence." *Kaliku v. United States*, 994 A.2d 765, 775 (D.C. 2010) (internal quotations omitted).

The Supreme Court has set forth several factors to consider when determining whether Confrontation Clause errors are harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684. "These factors include the importance of a witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

We must therefore assess whether it is clear beyond a reasonable doubt that, but for the erroneous admission of the 911 call, the jury would have found Mr. Austin guilty of robbery, burglary, and assault with intent to rob.

### 1.      Robbery Conviction

We agree with Mr. Austin that his robbery conviction cannot survive.  An essential element of robbery is that the defendant "[take] property of some value" from the victim.  *Bailey v. United States*, 257 A.3d 486, 499 (D.C. 2021); D.C. Code § 22-280      ("Whoever   by   force   or   violence . . . shall   take   from   the person . . . anything of value[ ] is guilty of robbery.").  The government's theory at trial was that Mr. Austin took Ms. Marvil's cash during the incident.  The only direct evidence supporting this theory was Ms. Marvil's own statements during the 911 call.  *See* J.A. at 1-3 (Ms. Marvil stating, among other things, that her assailant "took my money," "found my money," and had "$60 with him").

The 911 call was, therefore, central to the government's theory that Mr. Austin robbed Ms. Marvil of her money.  In the government's own words in closing argument, Ms. Marvil's statements during the call filled "a gap" in its evidence and told the jury "what happened to her that day in the stairwell."  To hammer home the point, the government played the recording at the beginning of its opening statement and referenced it repeatedly in closing argument.  *See Green v.*

*United States*, 231 A.3d 398, 414 (D.C. 2020) ("A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was [ ] prejudicial.") (internal quotations omitted); *Andrade*, 106 A.3d at 393 (that statements "were the crux of the prosecution's case is demonstrated by the emphasis given to those statements by the prosecutor in closing argument").

With the 911 call excluded, only thin evidence could support the jury's finding that Mr. Austin took cash from Ms. Marvil. As the government correctly points out, video footage from the market showed Ms. Marvil place her change in a green purse after making a purchase. Mr. Austin stood within arm's reach of Ms. Marvil during that time. Ms. Marvil then exited the store and returned to her apartment building; Mr. Austin followed her inside. After the incident, police found Ms. Marvil's purse empty. The inference that the government draws, of course, is that Mr. Austin took the money from Ms. Marvil during the incident.

But we cannot be sure, beyond a reasonable doubt, that the jury would have drawn this inference from the empty purse alone without the aid of the 911 recording. The jury had no evidence of what happened to the change in Ms. Marvil's purse between her departure from the market and the police arrival in her apartment sometime later. Ms. Marvil could have disposed of the change in any number of

ways during her walk from the market or after she went into her apartment following the incident in the lobby. Accordingly, we cannot say that the guilty verdict was "surely unattributable," *Kaliku*, 994 A.2d at 775, to the 911 call because the jury would not have been "compelled," as the government asserts, to infer that Mr. Austin took money from Ms. Marvil.

## 2.    Burglary Conviction

"The crime of burglary requires an entry, with or without a breaking, and a contemporaneous intent to commit a criminal offense." *Hawthorne v. United States*, 476 A.2d 164, 168 (D.C. 1984); *see also* D.C. Code § 22-801(a) ("Whoever shall . . . break and enter, or enter without breaking, any dwelling . . . with intent to . . . commit any criminal offense, shall . . . be guilty of burglary in the first degree."). Given the overwhelming evidence of these elements produced at trial, we agree with the government that there is no "reasonable possibility" that the admission of the 911 call contributed to Mr. Austin's burglary conviction. *Digsby v. United States*, 981 A.2d 598, 604 (D.C. 2009) (internal quotation omitted).

To start, Mr. Austin conceded at trial that he entered Ms. Marvil's apartment building, a dwelling for purposes of our burglary statute. *See Ruffin v. United States*, 219 A.3d 997, 1003-04 (D.C. 2019) (accepting the "broad ordinary meaning of 'dwelling' as any enclosed space used for human habitation" and concluding that the

common hallway of a multi-apartment row house is a dwelling). He does not appear to take a different approach on appeal. Even if he did, overwhelming evidence supported the jury's conclusion that Mr. Austin was the person shown in the camera footage at both the market and entering the apartment lobby. First, several of his fingerprints were found on the white plastic grocery bag that Ms. Marvil brought back from the store. Second, Mr. Austin's aunt, Renee Austin, confirmed his identity at trial through a photo identification procedure using a still shot taken from the video footage at Ms. Marvil's apartment building. The defense did not cross-examine Ms. Austin. Finally, the government also introduced body-worn-camera footage from an unrelated event approximately one month earlier showing Mr. Austin in the same jacket with distinctive chest zippers that he wore in the video footage from Ms. Marvil's building on the day of the incident. We are therefore confident beyond a reasonable doubt that, even excluding the 911 call, the jury would have found that Mr. Austin entered Ms. Marvil's apartment building.

Rather than challenge his presence in Ms. Marvil's apartment building, Mr. Austin appears to assert that he did not enter "with intent to . . . commit [a] criminal offense." D.C. Code § 22-801(a). Intent "is rarely capable of direct proof." *Bowman v. United States*, 652 A.2d 64, 67 (D.C. 1994). Thus, for purposes of burglary, we have held that "the government must also show 'other circumstances' that 'might lead reasonable people, based upon their common experience, to

conclude beyond a reasonable doubt that appellant intended to commit some crime upon the premises.'" *Id.* (quoting *Shelton v. United States*, 505 A.2d 767, 770 (D.C. 1986)).

The record, even without the 911 call, amply supports the conclusion that Mr. Austin intended to commit an assault when he entered Ms. Marvil's apartment building.[13] First, Ms. Marvil was in fact assaulted—a fact that Mr. Austin did not contest and that overwhelming evidence supported.[14] *See id.* at 68 ("the fact that appellant actually committed an assault very soon after he was inside the house is strong circumstantial evidence that he intended to commit an assault at the time he entered").

Second, the evidence—even without the 911 call—strongly indicated that Mr. Austin was the one who committed the assault. For one thing, the timing of Mr. Austin's arrival at and departure from the apartment building places him in the

---

[13] The indictment charged that the burglary was committed with the intent to rob, steal from, "and" assault Ms. Marvil. Although the government charged those intents in the conjunctive, the jury need only have found one of them, *see Carr v. United States*, 585 A.2d 158, 161 (D.C. 1991), and it was instructed in the disjunctive.

[14] First, Ms. Pettis treated Ms. Marvil's wounds, which included bruising and abrasions on her arms. Second, Ms. Pettis testified that Ms. Marvil said that she had been assaulted in her apartment building (the trial court overruled Mr. Austin's hearsay objection to this testimony and Mr. Austin does not challenge that ruling on appeal).

stairwell at the time of the incident. As discussed above, video footage from Ms. Marvil's apartment building showed Mr. Austin arrive immediately behind Ms. Marvil. Mr. Austin then followed Ms. Marvil through the lobby and up the stairs out of camera shot. Approximately forty seconds after Mr. Austin followed Ms. Marvil up the stairwell, Mr. Austin returned down the stairs back through the door. Less than two minutes after Mr. Austin left the building, Ms. Canales arrived to find Ms. Marvil calling for help, injured, with her groceries "[strewn] around on the ground." In addition, forensic analysis found three prints matching Mr. Austin's fingers and palm on a white plastic grocery bag that Ms. Marvil received at the market. Mr. Austin did not work at the market and the bags were kept behind the counter where only the market's owner and family members had access to them. There was no other evidence as to how else his prints could have ended up on the plastic bag.[15]

Third, the short period of time in which Mr. Austin was in the building indicates that he already had the intent to commit the assault before entering it rather than developing that intent at some point after entering it. *See id*.

---

[15] We do not rely on Officer Davis's trial testimony regarding Ms. Marvil's description of the assailant.

Fourth, no version of the evidence supports a belief that Mr. Austin happened to enter the building for another reason and then encountered Ms. Marvil and decided to assault her. *See id.* (defendant's "failure to exhibit any other purpose for being in the house" supported a finding that he entered the house with the intent to commit assault). Indeed, quite to the contrary: Mr. Austin had stood within arm's reach of Ms. Marvil at the market, followed Ms. Marvil out of the store almost as soon as she left, arrived at the apartment building just seconds after Ms. Marvil did, and followed her through the lobby, up the stairs, and out of camera range. The evidence thus overwhelmingly indicated that Mr. Austin had targeted Ms. Marvil for some crime prior to entering her building.

Finally, even if some jurors believed that Mr. Austin entered Ms. Marvil's building with the intent to *rob* her—a belief that would have been supported by the fact that Mr. Austin had seen Ms. Marvil put money back into her purse at the market—"it is not possible to commit robbery without also committing assault." *In re Z.B.*, 131 A.3d 351, 355 (D.C. 2016). Thus, if Mr. Austin had the intent to rob (even if the evidence, absent the 911 call, does not support harmlessness beyond a

reasonable doubt as to whether he *in fact* robbed Ms. Marvil), he necessarily had the intent to assault.[16]

Accordingly, even absent the 911 call, we are confident beyond a reasonable doubt that the jury would have convicted Mr. Austin of burglary.

### 3. Assault with Intent to Rob Conviction

As with robbery, we conclude that Mr. Austin's assault-with-intent-to-rob conviction cannot withstand *Chapman* harmlessness review. Although, as discussed above, the evidence amply supports the conclusion that Mr. Austin assaulted Ms. Marvil, with the 911 call out of the picture we cannot say beyond a reasonable doubt that he did so with the intent to rob her. With Ms. Marvil's statements excised, we cannot point to the fact of a robbery itself as evidence that Mr. Austin had the intent to rob. And, while robbery includes assault, the converse is not true, so we cannot say that jurors who might have believed that Mr. Austin had the intent to

---

[16] The indictment also included "steal from" as a predicate offense for the burglary. It is not clear if the phrase "steal from" contemplated the offense of theft (D.C. Code § 22-3211) or was used synonymously with "rob." *Cf. Bailey v. United States*, 257 A.3d 486, 494 (D.C. 2021) ("The word 'rob' itself has a number of meanings and in common parlance may be used interchangeably with 'steal.'"). In any event, on the facts of this case, we think it is clear beyond a reasonable doubt that no juror could have thought that Mr. Austin had the intent to commit a type of theft that was not from the person of Ms. Marvil and therefore did not involve some type of assault.

assault Ms. Marvil necessarily must have believed that Mr. Austin had the intent to rob Ms. Marvil.

Because, however, the evidence is overwhelming that Mr. Austin assaulted Ms. Marvil, we remand for entry of a conviction for assault under D.C. Code § 22-404. *See Quintanilla v. United States*, 62 A.3d 1261, 1266 (D.C. 2013).

* * *

In sum, we conclude that the Confrontation Clause error was harmless beyond a reasonable doubt as to Mr. Austin's burglary conviction, that it was not harmless beyond a reasonable doubt as to Mr. Austin's robbery and assault-with-intent-to-rob convictions, and that entry of a conviction for assault as a lesser-included offense of assault with intent to rob is appropriate.

### III. Conclusion

For the foregoing reasons, we reverse Mr. Austin's robbery and assault-with-intent-to-rob convictions, affirm Mr. Austin's burglary conviction, and remand for entry of a conviction for assault and for resentencing.

*So ordered*.